261 Md. 246 (1971)
274 A.2d 363
COUNTY FEDERAL SAVINGS AND LOAN ASSOCIATION ET AL.
v.
EQUITABLE SAVINGS AND LOAN ASSOCIATION, INC. ET AL.
[No. 319, September Term, 1970.]
Court of Appeals of Maryland.
Decided March 8, 1971.
The cause was argued before HAMMOND, C.J., and BARNES, McWILLIAMS, FINAN and SMITH, JJ.
David E. Betts, with whom were Betts, Clogg & Murdock and Theodore A. Miller on the brief, for County Federal Savings and Loan Association et al., part of appellants. Thomas N. Biddison, Jr., Assistant Attorney General, with whom was Francis B. Burch, Attorney General, on the brief, for Board of Building, Savings & Loan Commissioners, other appellant.
William M. Canby, with whom were Miller, Miller & Canby and George E. Krouse and Charles Wilson Schoeneman on the brief, for appellees.
*248 FINAN, J., delivered the opinion of the Court.
This case involves the application for a Maryland charter (Maryland Code (1966 Repl. Vol.), Art. 23, § 161M) by Equitable Savings and Loan Association, an unincorporated voluntary association (Old Equitable) with its main office and a branch in the District of Columbia, and a branch office already in existence in Wheaton, Montgomery County, Maryland. The application contemplated a plan whereby the savings and loan business (all assets and liabilities) of Old Equitable would be transferred to a new corporation which would be granted the charter and which would be known as Equitable Savings and Loan Association, Inc., a Maryland corporation (New Equitable). Both Old Equitable and New Equitable are appellees and we shall refer to them hereafter in the opinion as Equitable. They proposed to establish the Wheaton office as their principal office and to retain the two District of Columbia offices as branches.
A hearing on the charter application was held before the Board of Building, Savings and Loan Commissioners (Board). Code, Art. 23, § 161M (e). Several associations intervened in the proceedings before the Board in opposition to the granting of the charter and extensive written and oral testimony was taken on two separate days. On March 6, 1969, the Board issued an "Opinion and Order" in which it recognized that the following issues were before it:
"* * * first, whether the application for a Maryland Charter will be approved by this Board, second, whether the proposed transfer of assets and assumption of liabilities by the New Equitable from the Old Equitable will be permitted, and, third, if so, under what conditions, and, especially whether the New Equitable will be permitted to retain and to continue the two branches within the District of Columbia."
The Board found, as to the first question, that the "public *249 interest, convenience and advantage" would be served by permitting Equitable to obtain a Maryland charter. (Code, Art. 23, § 161M.) This was based upon a finding that Equitable is "fundamentally a Maryland organization seeking a Maryland charter and as such its savings and loan activity in Maryland should be subject to Maryland law." The facts noted in the opinion as supporting this conclusion were that mortgage loans made by Equitable are being made almost exclusively on Maryland property, and that the Wheaton branch was growing rapidly in deposits while the main office in the District of Columbia was markedly declining and the Friendship office was remaining stable. These facts were developed during the hearing by Equitable to show the decline in Washington, D.C. operations and the growth of the association in Maryland and its increasing orientation towards Maryland.
On the second question as to whether the proposed transfer of assets to, and assumption of liabilities by, the Maryland chartered association would be approved, the Board held that this would be allowed if the newly formed association complied with Departmental requirements predicated on a complete examination of the operations of Equitable both in Maryland and Washington, D.C.
The third question, regarding the continuation of the two branches within the District of Columbia, is the subject of this appeal. Applying the test set forth in Code, Art. 23, § 161V, with regard to the establishment of "Branch Offices," the Board found "there has not been a showing that the public interest, convenience and advantage will be served by permitting the new association to continue indefinitely either its F Street office or its Friendship office. We do find that the evidence compels a continuance on a temporary basis." (The office on F Street in the District of Columbia had been the principal office and the Friendship branch is also in the District, near the Maryland boundary line.)
The conditions imposed upon Equitable by the Board as a prerequisite to the granting of the charter were: *250 compliance with the Maryland requirements as might be proposed after examination by the Maryland Department of Building, Savings and Loan Association prior to transfer of assets; the obtaining of insurance for accounts; retention of a general reserve fund; and the submission of a program satisfactory to the Board for phasing out its F Street and Friendship offices in the District of Columbia by July 1, 1972. After a re-hearing, and the presentation of additional testimony, the Board extended the time for phasing out the District of Columbia offices for an additional two years.
At the hearing before the Board the County Federal Savings and Loan Association, Citizens Building and Loan Association, Metropolitan Federal Savings and Loan Association, Laurel Building Association and Montgomery Federal Savings and Loan Association had all intervened and participated in the hearing. All of these associations, with the exception of Montgomery Federal, are parties to this appeal. It is of significance that, following the Board's final order on June 12, 1969, no appeal was taken by the Intervenors. Equitable, however, waited until the last possible moment in which an appeal could be timely filed, and on the 32nd day following the order of the Board noted an appeal to the circuit court, still within the limit prescribed by the Rules, as the 30th day fell upon a Saturday. Maryland Rule B1, Rule B4 a and Rule 8. In the petition filed by Equitable with its appeal, as required by Rule B2 e, it cited as grounds for the appeal, "that the Board was in error in requiring the closing of the * * * two District of Columbia branch offices at a date certain and imposing other conditions in reference to the closing of said branch offices * * *." There having been no cross-appeal filed by the Intervenors (appellants here) before the Board, Equitable contends that the only issue preserved for review by the circuit court was that pertaining to the conditions imposed by the Board relative to the phasing out of the District of Columbia branch offices. Although an appeal from an order of the Board is heard de novo, Equitable contends that it is only a de novo *251 review with regard to that issue or issues from which the appeal was taken. Appeals from orders of the Board to the Circuit Court of Baltimore City or a county circuit court are authorized by Code (1966 Repl. Vol.), Art. 23, § 161H (d). Article 23, § 161H (e), entitled Judicial review, provides "The court to which the appeal is taken shall hear the matter de novo without a jury * * *." (Emphasis supplied.)
The Intervenors before the Board, who are the appellants here, also intervened in the appeal taken from the Board to the Circuit Court for Montgomery County. They strenuously objected there, and again here on appeal, to the limitation which the lower court placed on the scope of the de novo appeal from the Board to the circuit court. It is their contention that they should have been allowed to have presented evidence and argued matters going to the merits of all issues resolved by the Board and in particular the issue regarding the granting of the Equitable charter in Maryland.
By a pre-trial order, Judge H. Ralph Miller, in the court below, limited the scope of appeal to the sole issue of the continuation of the branch offices as raised in the petition for appeal. In taking this action the lower court relied heavily upon the case of Bullitt v. Kentucky Dept. of Highways, 298 S.W.2d 290 (Ky. 1957), and Maryland Rules B1 through B12, with particular reference to Rule B2 (e) which requires every appellant, in appealing the decision of an administrative agency, to file a petition setting forth "the action appealed from, the error committed by the agency in taking such action, and the relief sought."
The Bullitt case, supra, involved a factual situation quite similar to that in the instant case. Although the Bullitt appeal arose out of eminent domain proceedings, the statutory provisions for appeal with trial de novo were similar to those in the instant case when Article 23, 161H (e) is read together with Rule B2. In both instances, the grounds for appeal are required to be specified in the petition on appeal. The Kentucky Statute did, *252 however, contain express language of limitation, limiting the appeal de novo to "questions which are raised in the original statements of the grounds of appeal * * *."
Without regard to the statutory language, the Kentucky Court of Appeals reasoned that "[w]hile `trial de novo' on appeal means a trial anew, it only requires a new trial as to the questions in issue and not a re-examination of matters concerning which there was no dispute. In re Littlefield, 61 Wash. 150, 112 P. 234 [1910]." Bullitt, supra, at 292. The lower court, in the case at bar, bolstered its determination that the scope of appeal would be limited to the issue raised by the petition of appeal by observing that the Maryland Legislature by Chapter 575 of the Laws of Maryland 1966 amended § 161H of Art. 23 to bring the appeal provisions into conformance with the Maryland Rules of Procedure (Rule B 2 e). The Legislature thereby removed all the procedural provisions in the statutory provision for appeal in favor of the requirements found in Rules B1 through B12. In our opinion there is no doubt that Rules B1 through B12 are meant to control the procedure in this appeal from an administrative agency and we are satisfied that the provision in the statute authorizing the appeal from the Board (Code, Art. 23, § 161H) which provides for an appeal de novo, must be read in conjunction with Rules B1 through B12 and with particular reference to Rule B2 e, and should also be reconciled with the Administrative Procedure Act, Code (1965 Repl. Vol.), Art. 41, §§ 244 through 256.
In the case of Baltimore City v. Hurlock, 113 Md. 674, 78 A. 558 (1910), this Court recognized that the scope of a de novo appeal may be limited by a statute. Also, see Hensley v. Bethesda Metal Company, 230 Md. 556, 188 A.2d 290 (1963), an opinion written for the Court by Judge Hammond (now Chief Judge) regarding the exercise by the Court of Appeals of its constitutional grant of powers to "make rules and regulations to regulate and revise the practice and procedure in that Court, and in the other courts of this State which shall have the force of law until rescinded, changed or modified by the Court *253 of Appeals or otherwise by law." Maryland Constitution, Article IV, § 18A. In Hensley there is a specific discussion regarding appeals from an administrative agency which illustrates that the Maryland Rules of Procedure (in this instance Rule B 2 e) would apply despite a prior statute to the contrary and until a subsequent statute would repeal or modify the Rule. Hensley, supra, at 259-262.
Subsequent to the pre-trial order in the lower court, Daihl v. County Board of Appeals, 258 Md. 157, 265 A.2d 227 (1970), was decided by this Court. In Daihl we were presented with the problem of construing the provision of the Baltimore County Zoning Regulations which provided that appeals from the Zoning Commissioner shall be made to the County Board of Appeals, and which further provided by Section 501.3 of the Ordinance that * * * all decisions of the County Board of Appeals shall be made after notice and opportunity for hearing de novo upon the issues before said Board * * *." In Daihl we stated:
"We think that the context in which the term de novo is used in Section 501.6 and 501.3 (both quoted above) means that on appeal there shall be a de novo hearing on those issues which have been appealed and not on every matter covered in the application. In this sense de novo means that the Board of Appeals may hear testimony and consider additional evidence pertaining to the issue or issues presented on appeal. See Vol. 2, The Law of Zoning and Planning, Rathkoff, ch. 65-30, § 7. The original nature of a de novo hearing with its quality of newness is in contradistinction to a review upon the record as exists where matters are heard on certiorari. 73 C.J.S. Public Administrative Bodies and Procedure, § 204." 258 Md. 162.
* * *
"* * * we think the more sensible interpretation *254 of the meaning of the scope of a de novo hearing as used in relation to an appeal heard by the County Board of Appeals, from a decision of the Zoning Commissioner, is that it is restricted to the specific issue or issues resolved by the Commissioner from which an appeal has been taken. By exclusion, this may not encompass all issues which may have been resolved by the Commissioner in his decision, when more than one issue is involved. We think it is consonant with the concept of appeal, that it be coextensive with those issues concerning which the moving party or parties feel aggrieved. We are also buttressed in our reasoning on this matter by the knowledge that such hearings are adversay in nature and are ofttimes complicated. Furthermore, we are of the strong belief that an orderly procedural disposition of these matters requires specificity of the adverse ruling concerning which the aggrieved party seeks review." 258 Md. 163-164.
In Daihl we further noted that the appeal was to be "de novo upon the issues" and that Webster's New World Dictionary, (College Edition) defined issue as: "* * * a point, matter or question to be disputed or decided * * *." In the instant case the language of the statute provides that on appeal the court "shall hear the matter de novo." (Emphasis supplied.) We think any distinction that can be made between the language of the ordinance in Daihl and the Statute in the instant case as between the word "matter" vis a vis the term "issues" is not one of substance when we consider the context in which the terms were used in Daihl and in the instant case. In any event, a reading of the Statute (Article 23, § 161H (e)) in conjunction with Rule B2 e, which latter delineates the manner in which an appeal shall be taken from an administrative agency, leaves no doubt in our minds but that the appeal to the circuit court was limited in scope to the *255 specific issue embracing the continuance of the branches in the District of Columbia.
While we have been discussing the limiting of the scope of the de novo appeal to the specific issues from which the appeal was taken vis a vis a plenary hearing on all matters de novo, there is yet another facet of the de novo appeal, as provided by Article 23, § 161H (e), which must be resolved. Does the appeal de novo preclude the circuit court from considering the record made before the Board, i.e., the transcript of the testimony and exhibits presented at the hearing before the Board, and conversely restrict the court's consideration to the testimony and exhibits presented on the appeal? Judge Miller in the court below unquestionably thought he was restricted to the consideration of the evidence presented de novo and in circumscribing his scope of review stated:
"Although the trial de novo has been limited by the pre-trial order, the court in this case is not dealing with a statute which requires a certiorari type review in which it is bound by the findings of the administrative agency if the facts presented were fairly debatable unless the Board's ruling was arbitrary and against the weight of the evidence. As to items raised in the petition for appeal this is a de novo trial, and while the court is cognizant of the decision of the Board this opinion and order is based on the evidence before the court and the stipulations of the parties contained in the pre-trial order."
We think Judge Miller was wrong in so restricting his range of deliberation, although, under the facts of this case, we believe it amounted to harmless error, as we shall hereafter explain. We have already stated that we are of the opinion that the provision for a de novo appeal found in Article 23, § 161H (e) should be read in conjunction with Maryland Rules B1 through B12, which Rules are grouped under the subtitle "Administrative *256 Agencies  Appeal From," and the Administrative Procedure Act, Article 41, § 244 et seq. Certainly, Rule B7 which provides for the transmission of the record (which includes the transcript of the testimony before the agency) to the circuit court, is suggestive that a certiorari type of review is contemplated, nonetheless, it should be noted that Rule B10 provides that: "Additional evidence may be allowed when permitted by law." Likewise, we observe that the Administrative Procedure Act, Article 41, § 255 (g) (6) and (7) provides that the lower court should reverse the agency or board if it finds that the decision of the agency or board was "against the weight of competent, material and substantial evidence in view of the entire record, as submitted by the agency and including de novo evidence taken in open court; or unsupported by the entire record, as submitted by the agency and including de novo evidence taken in open court; * * *." (Emphasis supplied.)
The wording found in the Rules (B1 through B12) and in the Administrative Procedure Act (Section 255 (g) (6) and (7)) persuades us that the circuit court on appeal should, in reaching its judgment, take into consideration the evidence (the record) before the Board, together with the evidence presented at the de novo hearing. We think such a conclusion is also consonant with the legislative intent behind the enactment of the provision for a de novo appeal pursuant to Article 23, § 161H (e). Certainly, such a holding may be harmonized with Rules B7 and B10, and the Administrative Procedure Act, Article 41, § 255 (g) (6) and (7).[1]
*257 We cannot accept the proposition that the appeal de novo contemplated by Article 23, § 161H (e), is to be considered in the sense of a new proceeding, which we believe to be the purest form of a de novo appeal. In this regard, we learn something from a comparison of the instant case with our opinion in Volz v. State Roads Commission, 221 Md. 209, 156 A.2d 671 (1959), in which Judge Horney, writing for the Court discussed the meaning of a de novo hearing in an appeal taken from an award of the Board of Property Review, stating:
"[Code (1957 Ed.) Art. 89B, § 18, provides in part] In cases where the appeal is sought by the property owner he shall so notify the [State Roads] Commission in writing and it shall be the duty of the Commission to prepare and file the condemnation case in the proper court, * * * and the case shall be heard de novo and as if there had been no hearing before the board of property review. (Emphasis added.)
"It is clear that this section provides in terms for a court proceeding de novo, and it is equally clear that it does not provide for a review by the court, whether by way of affirmance, reversal or modification, of the award of the review board. The complete absence of any such provisions shows, we think, that the `appeal' under Section 18 [Code (1957 Ed.) Art. 89B] is not an appeal in the usual sense of the term, but is the institution of a new proceeding."[2] 221 Md. 212-213.
The difference in the wording of Article 89B, § 18, as *258 contrasted with Article 23, § 161H (e) is immediately apparent, as language similar to the wording, "as if there had been no hearing before the board of property review," found in Article 89B, § 18 is completely absent from Article 23, § 161H (e). Certainly by the wording used in Article 23, § 161H (e) the Legislature did not contemplate any new proceeding in providing for a de novo appeal from a decision of the Board of Building, Savings and Loan Commissioners. We think an appeal providing for new evidence on the issues appealed from as well as a consideration of the record before the Board, is what was intended. We cannot discount the fact that the Legislature by Chapter 575 of the Acts of 1966 amended Article 23, § 161H to bring the appeal provisions generally in conformity with Rule B2 (e). It would, therefore, seem to be a logical extension of the legislative intent to give as full interplay among the Rules, The Administrative Procedure Act, and Article 23, § 161H (e) as a reasonable interpretation might permit.
We have spent considerable time in this opinion discussing the nature and scope of the hearing held by the circuit court on the appeal from the Board. We have done this because it is essential not only to determine the issue which was properly before the lower court, but also the evidence it should have considered in deciding that issue. It has been established to our satisfaction that the only issue was the question of a continuation of the branch offices in the District of Columbia, and in determining that issue the court should have considered not only the new evidence presented to it but also the contents of the record before the Board. The only new evidence presented to the circuit court on the issue of the continuance of the branches was presented by Equitable. It sought to establish through its witnesses that the branches in the District of Columbia would promote the public interest, convenience, and advantage of the people of Maryland. The Intervenors failed to present any contrary evidence but contented themselves with cross-examination of Equitable witnesses.
*259 We have stated that the lower court erred in reaching its judgment by considering only the evidence presented before it and in not considering the record made before the Board. We further stated that under the facts of this case we believed this to be harmless error. We say this because the issue before the lower court was the question of the continuance of the District of Columbia branches. After reviewing the record before the Board (including the testimony on this issue found in the record) and considering the evidence presented on the de novo appeal, we think it would have been "against the weight of competent material and substantial evidence in view of the entire record, as submitted by the agency and including the de novo evidence taken in open court," for the court to have affirmed the Board. Code (1965 Repl. Vol.), Art. 41, § 255 (g) (6).
The Intervenors took umbrage with the fact that Equitable varied its position regarding the importance of the District of Columbia offices in relation to its overall organization. In its initial appearance before the Board, Equitable took the approach that it should be granted a Maryland charter because its Maryland business was proliferating by leaps and bounds and that its District of Columbia business was in a state of decline, although it consistently insisted that it would like to retain its District of Columbia branches and estimated it would lose $20,000,000 in deposits were it to close its F Street branch. However, upon a re-hearing concerning the extension of the phase-out period it changed its tactics and became more emphatic regarding the importance of the District of Columbia branches to its overall operation. On appeal to the circuit court, Equitable again concentrated its efforts on the showing of the need for the continuation of the District Columbia branches; indeed, that was the sole issue then to be reviewed. We do not view this change of tactics as an unsettling factor in this case for we would note that few are the parties participating in an appeal de novo who, having been educated during the proceeding below, do not seek to improve their *260 lot on appeal by the presentation of new evidence within legitimate bounds. We think that is what occurred here. We might further add that this is one of the inherent weaknesses in a de novo hearing, as opposed to an appeal strictly on the record.
Before considering the import of the evidence found in the record from the Board and before the court, we deem it appropriate to take a look at the several questions of law raised by the Intervenors regarding the continuation of the District of Columbia branches. The first contention is that, as a consequence of the lower court's order, a new Maryland chartered building and loan association has been authorized to operate in Maryland and to maintain branch offices in a foreign jurisdiction, a result which is not permitted under Maryland law, according to the Intervenors.
We think the Board itself gave a competent and satisfactory answer to this argument, when it stated:
"A further question which is raised by this case is the corporate power of a Maryland association to have branches outside the State of Maryland, yet another point not yet decided under the Act. The only applicable section of the Act in this regard is [Art. 23] section 161V which gives the Director the authority to approve the establishment, maintenance and relocation of a branch office, the criteria for his approval is a finding by the Director that such branch office `will promote the public interest, convenience and advantage and whether such branch office will be efficiently operated in accordance with the policies of this subtitle.'
"It is significant that there is nothing whatsoever in the Act specifically denying a Maryland association the right to operate a branch office outside of the State of Maryland. We recognize that the Act was drafted to supplement the general corporation law of Maryland, which is *261 therefore the determinative law as to the corporate powers of savings and loan associations, unless specifically modified by the Act. [Code, Art. 23, § 9 General Powers.] Under the general law a Maryland corporation without question may operate in any place where its business so requires. The only limitation which the Act imposes upon this general power, relevant here, is the requirement for prior approval by the Director. Section 156 deals only with associations which are not chartered under Maryland law. It is obvious, therefore, that a Maryland savings and loan association may, with the approval of the Director, have a branch office outside the State of Maryland, provided, of course, that the foreign jurisdiction will permit such branch."
The second point raised by the Intervenors was that the Maryland law (Code, 1966 Repl. Vol., Art. 23, § 161U) expressly prohibits the transfer to a duly chartered Maryland savings and loan association, of the assets of a foreign chartered building and loan association. Such a conclusion can only be reached by an artificial and tortured interpretation of the wording of the statute. Code, Art. 23, § 152 provides for the merger of an unincorporated association which existed any time prior to the adoption of Article 23, with an incorporated association. It is our opinion that the purpose of Section 161U is to provide for the merger of "any" association with an incorporated one. The Intervenors mistakenly overemphasized certain words in the statute, specifically in Section 161U wherein they cite and then quote in part, italicizing the following words:
"Any association shall have power to consolidate or merge or sell or transfer, all or substantially all of its property and assets to any other incorporated association in this State. * * *."
[Emphasis supplied by the Intervenors.]
*262 Actually, with only usual and proper emphasis the quoted provision would read:
"Any association shall have power to consolidate or merge with or sell or transfer, all or substantially all of its property and assets to any other incorporated association in this State. * * *."
[Emphasis supplied.]
Over and above this misplaced emphasis on the words of § 161U, is the Intervenors' failure to refer to the controlling definitional provision of the statute, § 161B. Section 161B of Article 23 provides in part:
"161B. Application of provisions.

(a) Definition of `association'  As used in this subtitle, the word `association' shall mean building, savings and loan or homestead association or any other similar association by whatever name called.
(b) Domestic and foreign associations.  The provisions of this article shall apply to all associations heretofore or hereafter organized under the laws of this State; and to all foreign associations duly authorized to do business in this State; * * *."
We think this argument of the Intervenors which seeks to restrict the transfer of assets of a foreign chartered association to a Maryland chartered savings and loan association, is an effort to exalt semantics over substance and is without merit. We further note that this point was not argued before the lower court and we fail to find in the record where it was pressed before the Board. (Maryland Rule 885.)
The third point of law raised in connection with the application of Article 23, is that the decision of the lower court violates the spirit and intent of Section 156 of the Article which contains the "grandfather clause" proviso to the effect that only those branches of a foreign association *263 shall be permitted to operate in Maryland as existed on or before June 1, 1955. This is an argument not predicated on logic but apparently designed as some type of emotional appeal. In pursuit of this argument it is stated that the "grandfather clause" in spirit also intended to guard against branches being established in foreign jurisdictions. We think the Board had a ready answer to this argument when it stated that the purpose of the freeze on branches in Maryland of a foreign association (Ch. 234 of the Acts of 1955) was to bring savings and loan activity affecting the people of Maryland under the control of Maryland law. The Board rationalized that, in the instant case, by granting Equitable a Maryland charter it was bringing regulation under Maryland law to an association whose customers were predominantly Maryland citizens and thus, in so doing, it was following the intent and purpose of the 1955 amendment to the law.
We think the contentions urged upon us by the Intervenors are placed in proper perspective when we note the obvious lack of citations in support of them. It is further interesting to observe that the Attorney General of Maryland, appearing in this Court on behalf of the Board, at no time questioned the authority of the Board to approve the merging of Old Equitable with New Equitable and the granting of the Maryland charter to New Equitable, or the legal right of the Board to authorize the operation and maintenance of branches in the District of Columbia. The sole thrust of the Attorney General's brief is directed at the lower court's disagreeing with the Board, relative to the "public interest, convenience and advantage" to be served by the granting of the charter.
We think it also conducive to more enlightened understanding of the present litigation to peruse the very knowledgeable observation of the Board to the effect that:
"The Intervenors primarily fear a future ability of the new Maryland Equitable to open additional Maryland branches, which they contend is a right not available to the old Equitable. It *264 is not necessary here to decide the latter contention. Of course, if the charter is granted, the new Equitable can apply for new branches as every Maryland association can apply. But this question is not before us at this stage, because no additional Maryland branches are sought. Each branch application will be given appropriate notice and hearing, on its merits. We might remark on this precise point, that Section 161A of the Act suggests that there is a public interest in fostering healthy competition among associations, so long as it does not become suicidal. We might also remark that the Washington suburban area of Montgomery County is growing so fast and is so wealthy that an upsurge in savings and loan activity there seems inevitable and highly desirable."
Turning to the evidence presented before the Board, as well as that introduced de novo before the lower court, we find that while Equitable's testimony before the Board regarding its District of Columbia branches was given a low key treatment, as compared with the bullish picture painted of its Wheaton operation, nonetheless, it can be reconciled with the testimony given before the lower court. The testimony before the Board, regarding the branch offices, was far more superficial than the in-depth testimony given before the court which latter was bolstered by statistical data. Viewing the testimony before the Board in a light most favorable to the Intervenors, it presented the picture that the F Street branch was in a neighborhood which has become blighted and that although the deposits amounted to some $35,000,000, approximately $20,000,000 consisted of dormant accounts and that there was scarcely any "walk in" traffic. Equitable also stated that the Friendship branch had, in its opinion, reached maximum growth. However, Equitable consistently held to the proposition that it would lose $20,000,000 in deposits if it closed the F Street branch. It *265 also, under questioning from the Board, reluctantly admitted that it could phase out the Friendship branch fairly soon, but that it would take years to phase out the F Street office. There was also evidence that the F Street branch was in an area slated for urban renewal and that the neighborhood should eventually become rehabilitated.
On appeal, the viability of the branches was covered in much greater depth, and the testimony before the court may be summarized as follows:
William K. Hogan, the Assistant Vice President of Old Equitable and the officer in charge of computer operations testified that at least 24.20 percent of the number of accounts in combined District of Columbia offices are held by Maryland residents; that 21.92 percent of the amount deposited in accounts in the combined District of Columbia offices is held by Maryland residents; that $7,181,000 is held by the combined District of Columbia offices as deposits of Maryland residents; that 24.50 percent of the number of saving certificates in the combined District of Columbia offices are held by Maryland residents; that 23.54 percent of the new accounts in the combined District of Columbia offices are held by Maryland residents; that 24.62 percent of the active accounts in the combined District of Columbia offices are held by Maryland residents; that 22.90 percent of the dormant accounts in the combined District of Columbia offices are held by Maryland residents; that the savings accounts in the combined District of Columbia offices total $32,747,319, while the savings accounts at the Wheaton office total $23,728,861.
Frederick S. Genau, vice president and loan officer of Old Equitable, testified that the mortgage loan portfolio discloses that 69.21 percent of all loans are secured by realty in Maryland; and that during the immediate prior two and one-half years, 78 percent of loans were on Maryland property, 15 percent on District of Columbia property and 7 percent on Virginia property.
J. Lee Sammons, Senior Associate with the firm of Hammer, Greene, Siler Associates and an expert in the field of analysis of economic data, testified that the Bureau *266 of the Budget and the Interstate Commerce Commission both recognize the metropolitan area surrounding the District of Columbia as part of the District of Columbia commercial and economic unit that the U.S. Census survey showed that in 1960, 46 percent of the residents of Montgomery and Prince George's County commuted to Washington, D.C.; that 25 percent of the employees in the F Street area are Maryland residents; that the business of the District of Columbia offices of Equitable with Maryland residents stems primarily from persons employed in the District of Columbia in the area of Equitable's respective District of Columbia locations; that at least 1,785 Maryland residents are served by the District of Columbia offices of Equitable and there are several Savings and Loan Associations located in Maryland who serve less than 1,785 Maryland residents and have less than 7.2 million dollars in deposits by Maryland residents; that of the 1,785 accounts in the District of Columbia offices of Equitable held by Maryland residents, only 117 have addresses located in Wheaton and that there are 1,668 such accounts held by Maryland residents who do not have a Wheaton address as their residence; that there are dramatic changes planned for the improvement of the neighborhood of the F Street office and that the Washington Metropolitan Area Transit Authority has estimated that there will be 137,400 employees who are Maryland residents working in the area of the F Street office in 1990. He also noted that the F Street office of Equitable is in a very convenient location to serve Maryland residents who will be using the proposed subway system commonly known as the "Metro System." As regards the Metro System, Mr. Sammons stated that the F Street office "will be one of the most convenient spots in all of Washington."
Dr. Irwin Friend, Professor of Finance and holder of the Richard K. Mellon chair at the Wharton School of Finance at the University of Pennsylvania, author of several studies in the field of finance, and author of a four volume study of the savings and loan industry sponsored *267 by the U.S. Congress and the Federal Home Loan Bank Board, known throughout the industry as the "Friend Report" testified that convenience of location is the single most important factor considered by depositors in choosing a savings and loan institution; that if Equitable were forced to close its District of Columbia offices, well over one-half of the 35.4 million dollars deposited in the two District of Columbia offices would be lost in the relatively short period; that if over one-half of the said deposits were withdrawn, Equitable would either have to sell its mortgages on the market at a great loss or borrow from the appropriate Federal Home Loan Bank and pay an amount of interest in excess of the return on the present mortgage portfolio of Equitable, a circumstance that "would be extremely serious for the continued existence * * *" of the association, and in either case, no loans could be made in the foreseeable future, with the resulting permanent loss of customers; and that it would be unrealistic to assume that any substantial proportion of persons withdrawing funds from the District of Columbia offices would redeposit them in the Wheaton office.
As we have already stated, we think the lower court was in error in not considering in its deliberations the record made before the Board as well as the evidence submitted at the trial de novo; however, as we have previously indicated, we view this to have been harmless error and the failure to review the record from the Board should not, in our opinion, have prejudiced the Intervenors insofar as the final result reached by the court is concerned. It follows, therefore, that the order of the lower court reversing that part of the decision of the Board calling for the phasing out of the District of Columbia branches should be affirmed.
Order affirmed, appellants to pay costs.
NOTES
[1] The confusion attendant to the manner in which appeals from administrative agencies should be perfected and conducted, prompted the following graphic language from the sub-committee drafting Rules B1 through B12 in 1962:

"The subcommittee in preparing its initial drafts of this Rule for the consideration of the whole Committee was confronted at the outset with a substantial volume of statutory provisions dealing with the procedural asspects of appeals from State and local administrative agencies to the nisi prius courts. The Code of Public General Laws was examined page by page in an effort to discover all of these statutory provisions. In all there are approximately one hundred different statutory provisions for appeal dealing with approximately forty administrative agencies. * * *
"There is a considerable variation among the several existing statutory procedures for appeal from administrative agencies. In this Rule the Committee has endeavored to bring uniformity to this field." Committee note, Maryland Rule B1.
[2] The italicized language was deleted from Article 89B, § 18 by Ch. 36, § 56 of the Acts of 1962.