795 A.2d 754

**Robert C. SIMPSON et al.**

v.

**CONSOLIDATED CONSTRUCTION SERVICES, INC., et al.**

**Robert C. Simpson**

v.

**New Panorama Development Corporation, et al.**

**Nos. 1960 Sept. Term, 1999, and 523 Sept. Term, 2000.**

Court of Special Appeals of Maryland.

Feb. 6, 2002.

Reconsideration Denied April 17, 2002.

608

610

Douglas A. Rubel, Rockville, for appellants.

Jeffrey M. Kotz (Kandel, Klitenic, Kotz, Betten & Chernow, LLP, on the brief), Towson, for appellees.

Argued before KENNEY, KRAUSER, and CHARLES E. MOYLAN, Jr., (Retired, specially assigned), JJ.

KRAUSER, Judge.

A debtor must be just before he is generous. Unfortunately, that principle was not observed here. Appellee and judgment debtor, New Panorama Development Corporation ("New Panorama"), used a settlement agreement, resolving lawsuits it had filed against its contractors, to direct that settlement funds, contributed by those contractors, be used to pay its legal fees and one of its contractors, at the expense of its judgment creditors. Payment was then made by those contractors to a settlement fund, created by that agreement, even though writs of garnishment had been served on all but one of them by New Panorama's judgment creditors. While New Panorama was arguably generous—at least to its attorney and one contractor—it was hardly just. And that is the gist of this appeal.

This case began when New Panorama purchased land in Howard County from Robert F. Simpson and the estates of Julia V. Simpson and Willis E. Simpson (collectively, the "Simpsons"), for the purpose of developing a residential com-

munity to be known as "Pleasant Chase." To purchase that property, it signed a mortgage agreement with Robert F. Simpson, who was then acting individually and as the personal representative of the two estates. That agreement required New Panorama to make an initial down payment and then monthly payments to the Simpsons until the date upon which the balance of the mortgage was due. When New Panorama failed to make those payments, the trustees of the estate of the now deceased Robert F. Simpson, together with the new personal representative of the estates of Julia V. Simpson and Willis E. Simpson, filed suit in the Circuit Court for Howard County against New Panorama ("Simpson v. New Panorama") and obtained a judgment.

In the meantime, the roads at Pleasant Chase that had been paved had begun to settle and rupture. That led New Panorama to file lawsuits in that same court against the contractors that it believed were responsible for the failure of the roads ("New Panorama v. CCS"). Those contractors were also served with writs of garnishment by the Simpsons, now judgment creditors of New Panorama, in the event that New Panorama obtained a judgment against some or all of the contractors.

To avoid those garnishments and to dispose of all cross and counter-claims, New Panorama and its contractors entered into a settlement agreement whereby no money would ever touch New Panorama's hands; but one of its contractors, Consolidated Construction Services, Inc., as well as New Panorama's lawyer, Donald J. McCartney, would be paid from a settlement fund [1] established by the parties, monies allegedly owed them by New Panorama. This legal legerdemain was contingent, however, upon the dismissal of all outstanding writs of garnishment by the circuit court.

1. According to the settlement agreement, the funds contributed by the contractors were to be "deposited into two separate federally insured, interest bearing accounts with a bank or a savings and loan association, doing business and having an office in Maryland." We shall refer to these accounts as the "settlement fund."

Learning of that agreement, the Simpsons filed a motion to intervene in *New Panorama v. CCS* to protect and enforce their garnishments. That motion was denied. The circuit court then dismissed, upon motion, all of the writs of garnishment that had been served on New Panorama's contractors as well as those that were later served on McCartney and the settlement fund's escrow agent, Jeffrey M. Kotz.

At issue here are two orders: one denying the judgment creditors' motion to intervene in *New Panorama v. CCS*, the other granting the motions of New Panorama's contractors and others to terminate the judgment creditors' garnishments in *Simpson v. New Panorama*. In this consolidated appeal from those orders, the judgment creditors, appellants Robert C. Simpson and J. Kevin Doyle, trustees of Robert F. Simpson Trust and personal representatives of the estates of Julia V. Simpson and Willis E. Simpson, seek to reverse the order denying them entry into appellee New Panorama's suit against appellee contractors, Atlas Plumbing and Mechanical Inc. ("Atlas"), Consolidated Construction Services, Inc. ("CCS"), Maryland Paving and Sealant, Inc. ("MPS"), and Professional Services Industries, Inc. ("PSI"), and to reinstate the writs of garnishments served on them as well as the ones served on appellees, Donald J. McCartney ("McCartney"), and Jeffrey M. Kotz ("Kotz").

This appeal therefore presents two questions:

I.  Did the circuit court err in dismissing appellants' writs of garnishment?

II. Did the circuit court err in denying appellants' motion to intervene?

For the reasons that follow, we shall reverse the order of the circuit court terminating the writs of garnishment that were served on appellees CCS, PSI, Atlas, MPS, McCartney, and Kotz, affirm the termination of the writ of garnishment served on McCartney, and remand this case to that court for further proceedings consistent with this opinion. Additionally, the denial of appellants' motion to intervene shall be affirmed.

## BACKGROUND

Appellee New Panorama is a real estate development company that develops home sites for resale to residential builders. To do so, New Panorama purchases raw land, prepares a site plan, obtains necessary permits, installs sewer lines, water lines, and roads, and then sells individual lots to residential builders. In 1992, it purchased real property in Howard County from Robert F. Simpson, now deceased, which it later developed into a residential community known as "Pleasant Chase." In developing that community, New Panorama contracted with CCS to do utility work, PSI to conduct soil testing, and MPS to perform road work. Atlas was hired by Lovell Regency, a residential builder, to provide plumbing services.

Shortly after being paved, the roads began to settle, resulting in ruptures and depressions that required extensive repair. This, in turn, led to a dispute among the contractors and New Panorama as to who was responsible for this problem. When the dispute was not resolved, New Panorama, represented by appellee McCartney, filed separate suits against each of the contractors in the Circuit Court for Howard County.[2] These suits were eventually consolidated.

In response to New Panorama's suit, CCS and PSI filed counter-claims against New Panorama, claiming that it had failed to pay for services rendered by them for Pleasant Chase.[3] MPS also filed a counter-claim against New Panorama. In that counter-claim, it alleged that New Panorama

---

**2.** On January 5, 1996, New Panorama filed suit against CCS for breach of contract, breach of warranty, and attorney's fees. On November 6, 1996, it filed suit against PSI for breach of contract, breach of warranty, professional malpractice, and negligence. On that same day, it filed a lawsuit against Atlas for negligence. It also sued MPS but, as that complaint was not included in the record extract, we are unable to state when or why it was filed.

**3.** CCS also filed a third party claim against International Fidelity Insurance Company, which had issued payment and performance bonds on behalf of New Panorama for Pleasant Chase. PSI also filed a cross-claim against International Fidelity Insurance Company.

breached its contract with MPS by failing to provide MPS with a prepared site and thereby prevented it from installing roads, gutters, and curbs at Pleasant Chase.

In addition to these counter-claims, all of the contractors, but CCS, filed cross-claims. MPS and Atlas filed cross-claims against each other and against all of the other contractors,[4] and PSI filed cross-claims against MPS and Atlas.[5]

After this tangle of cross-claims and counter-claims was filed, appellants filed a complaint against New Panorama claiming, among other things, that New Panorama had defaulted under the terms of the mortgage agreement it had entered into to purchase the property on which it built Pleasant Chase. Appellants obtained a judgment against New Panorama for $791,857.80. To enforce that judgment, appellants served writs of garnishment on CCS, PSI, and Atlas to garnish any monies that may have been owed by those entities to New Panorama.

Thereafter, New Panorama and its contractors, including those that had already been served with appellants' writs of garnishment, agreed to resolve their differences by entering into a "Settlement Agreement, Mutual Release and Escrow Agreement." That agreement was read into the record and subsequently executed by all the parties to it, which included New Panorama, PSI, CCS, MPS, Atlas, International Fidelity Insurance Company ("IFIC") (New Panorama's bonding company), McCartney, and Kotz, who was named by the agreement as escrow agent for the settlement funds.

In the agreement, the parties stated that it was their "intention and desire" to "resolve any disputes" among them relating to the Pleasant Chase development "by paying CCS

---

4. The cross-claims filed by MPS against CCS, PSI, and Atlas, alleged negligence and breach of contract. The cross-claims filed by Atlas against MPS, CCS, and PSI, alleged negligence and breach of contract.

5. PSI filed cross-claims against MPS and Atlas seeking contribution and indemnity from those companies in the event that PSI was found liable to New Panorama.

$77,500 plus interest in satisfaction of its counter-claim, third party claim, and indemnity claim," although CCS had not yet brought an indemnity claim. They further stated that "[f]or purposes of this Settlement Agreement ... PSI, MPS, and Atlas concede that CCS would have the right to institute a claim against them for indemnity, contribution, and/or negligence ... with respect to damages that could conceivably be awarded in favor of New Panorama against CCS and paid by CCS as a result of the Litigation."

The agreement also provided that McCartney would be paid "$95,000 plus interest in satisfaction of his attorney's lien," stating that McCartney had served "written notice of his lien ... established pursuant to § 10–501 of the Business Occupations and Professions Article, Annotated Code of Maryland, and Rule 2–652(b) of the Maryland Rules of Civil Procedure" upon all parties to the settlement agreement for legal services he had rendered in *New Panorama v. CCS*. According to the settlement agreement, McCartney's lien was for "fees, expenses, costs and other compensation ... in the amount of one-third of the gross amount of any recovery or actual attorney's fees, whichever is greater."

To generate the funds to be paid to CCS and McCartney, the settlement agreement required that, upon execution, Kotz, as escrow agent of the settlement fund, be paid $75,000.00 by PSI, $47,500.00 by the insurance company for CCS, $45,000.00 by the insurance company for MPS, and $5,000.00 by the insurance company for Atlas. The settlement agreement stated that "New Panorama [did] not have any legal or equitable interest in the Settlement Funds," but did have the right "to compel the disbursement [of the funds] by the Escrow Agent in accordance with [the] Settlement Agreement."

The settlement agreement also declared that it was "contingent upon the termination of [appellants'] garnishments." It specified that Kotz could neither distribute the settlement funds nor file a stipulation of dismissal until, among other things, he had received a court order "dismissing with prejudice [appellants'] garnishments" and until that order had

become final after "the conclusion of all appellate review thereof and further proceedings on remand."

The settlement agreement also stated that "in the event that any court rules that the Settlement Funds or any portion thereof are subject to garnishment by [appellants] ... the settlement contemplated herein shall be deemed null and void *ab initio*, and the parties shall resume their positions in the Litigation as if [the] Settlement Agreement were never entered into." If that occurred, "any party who ha[d] deposited funds into the Escrow Account may, at its option, leave said funds in the Escrow Account pending an alternative resolution of the [*New Panorama v. CCS* case] or demand that the Escrow Agent refund said money."

After learning of the agreement, appellants filed a motion to intervene and a motion to enforce garnishments in New *Panorama v. CCS*. In their motion to intervene, appellants argued that appellees' "settlement is specifically designed to avoid [appellants'] judgment against New Panorama and [appellants'] garnishment liens." They therefore claimed that under Maryland Rule 2–214 they were entitled to both permissive intervention and intervention as of right "for the purpose of protecting and enforcing their security interest in the proceeds" of appellees' settlement agreement.

Appellees opposed appellants' motions, asserting, among other things, that appellants' interests were adequately protected "through the garnishment proceedings" that were instituted in their case against New Panorama, *Simpson v. New Panorama*, and that that case was the proper forum in which to enforce the writs of garnishment.

After a hearing on those motions, the circuit court denied appellants' motion to intervene, stating that intervention as a matter of right was not appropriate because "it's anticipated that Motions to Terminate the Garnishments are going to be filed" and that appellants' "interests [would be] adequately protected" in the garnishment proceedings. The court also ruled that permissive intervention was not warranted "because there is no question of law or fact in common with the issues

and facts in the C.C.S. case." From the denial of that motion, appellants noted an appeal to this Court.

Appellants' then served writs of garnishment on MPS, Kotz, and McCartney whereupon CCS, PSI, Atlas, MPS, and Kotz filed a joint "Motion to Terminate Garnishments" in *Simpson v. New Panorama*, while McCartney filed a separate motion in that case seeking the same relief. When those motions were granted, appellants noted a second appeal to this Court, which was thereafter consolidated with their earlier appeal.

## GARNISHMENTS

For the uninitiated, garnishment is a particularly mysterious and fearsome weapon in the arsenal of debt collection. It therefore behooves us to review briefly the nature of a garnishment and the proceedings that attend it.

Garnishment is a form of attachment. *Catholic Univ. of America v. Bragunier Masonry Contractors, Inc.*, 139 Md.App. 277, 293, 775 A.2d 458 (2001). It is "a means of enforcing a judgment," which "allows a judgment creditor to recover property owned by the debtor but held by a third party," the garnishee. *Parkville Federal Savings Bank v. Maryland National Bank*, 343 Md. 412, 418, 681 A.2d 521 (1996). "Once [a] writ of garnishment is issued and laid in the hands of the garnishee, he is bound to safely keep the assets of the debtor in his possession, together with any additional assets that come into his possession up to the time of trial." *Catholic Univ.*, 139 Md.App. at 293, 775 A.2d 458. To be more precise, a writ of garnishment, when served, creates "an 'inchoate lien' that is binding and prevents the garnishee from disposing of those of the assets in his possession until such time as a judgment is entered in the garnishment proceeding." *Id.* at 294, 775 A.2d 458. "[I]f the property possessed by the garnishee, after service but prior to judgment, is not in the hands of the garnishee at the time of the judgment hearing, because the garnishee surrendered the property to the debtor, the garnishee is liable for the value of the debtor's property which came into her hands from the time she was served with

the writ until the time of the hearing, and a judgment *in personam* will be rendered against the garnishee for any deficiency." *Flat Iron Mac Associates v. Foley,* 90 Md.App. 281, 292, 600 A.2d 1156 (1992).

■ Nevertheless, a judgment creditor "can recover only by the same right and to the same extent that the judgment debtor might recover," *Fico v. Ghingher,* 287 Md. 150, 159, 411 A.2d 430 (1980), and "[f]or this reason ... the rights of the plaintiff/judgment creditor against the defendant/garnishee, cannot rise above the rights of the judgment debtor." *Catholic Univ.,* 139 Md.App. at 294, 775 A.2d 458. Finally and, as we shall see, of special importance to our resolution of the issues before us, attachable property "includes any debt owed to the judgment debtor, whether immediately payable, unmatured, or contingent." Md. Rule 2–645(a).

### GARNISHMENT PROCEEDINGS

■ A garnishment proceeding is an action in which it is determined "whether the garnishee has any funds, property or credits which belong to the judgment debtor." *Fico,* 287 Md. at 159, 411 A.2d 430. It is "an action by the judgment debtor for the benefit of the judgment creditor which is brought against a third party, the garnishee, who holds the assets of the judgment debtor." *Id.* It "brings to a test whether the garnishee has in his hands funds, property or credits for which the debtor would himself have a right to sue." *Northwestern Nat'l Ins. Co. v. William G. Wetherall, Inc.,* 267 Md. 378, 384–85, 298 A.2d 1 (1972).

A judgment creditor initiates the garnishment process by filing a request for a writ of garnishment "in the same action in which the judgment was entered." Md. Rule 2–645(b). Once a request is filed, "the clerk ... issue[s] a writ of garnishment directed to the garnishee." *Id.* The writ of garnishment must then be "served on the garnishee in the manner provided by Chapter 100" of Title Two of the Maryland Rules. Md. Rule 2–645(d). Upon being properly served, a garnishee may file an answer to the writ. In the answer,

the garnishee must "admit or deny that [he] is indebted to the judgment debtor or has possession of property of the judgment debtor." Md. Rule 2–645(e). It may also "assert any defense that the garnishee may have to the garnishment, as well as any defense that the judgment debtor could assert." *Id.* If a timely answer is not filed, the judgment creditor may seek a default judgment against the garnishee. Md. Rule 2–645(f). "If the garnishee files a timely answer," however, "the matters set forth in the answer [are] treated as established for the purpose of the garnishment proceeding unless the judgment creditor files a reply contesting the answer within 30 days after its service." Md. Rule 2–645(g). Once the reply is filed, the matter then proceeds "as if it were an original action between the judgment creditor as plaintiff and the garnishee as defendant and shall be governed by the rules applicable to civil actions." *Id.*

## STANDARD OF REVIEW

To determine the appropriate standard of review, we must first determine the procedural posture of the order or judgment that is before us. Appellants maintain that the motions to terminate garnishments were in effect motions to dismiss for failure to state a claim upon which relief can be granted and that we should apply the standard of review applicable to such motions. Attached to those motions, however, were several "matters outside the pleading," including a copy of the appellees' settlement agreement.[6] Md. Rule 2–322(c). According to Maryland Rule 2–322(c), "[i]f, on a motion to dismiss for failure of the pleading to state a claim upon which relief can be granted, matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment."

Because "matters outside the pleading [were] presented," and not excluded by the circuit court, we conclude that the

---

6. Although McCartney's motion did not attach a copy of the settlement agreement as the motion of the other appellees did, the court also relied upon that agreement in granting his motion as well.

motions to terminate garnishments were treated as motions for summary judgment by the circuit court and not as motions to dismiss, as appellants contend. In fact, our review of the record shows that not only did appellees rely heavily on that settlement agreement in seeking an order terminating the writs of garnishment, but so did the court in terminating the garnishments. In rendering its decision, the court explained that "none of th[e] [appellees] hold any property of New Panorama or expect to have any property of New Panorama," and that the settlement that was "entered into would not dictate otherwise."

Having concluded that we should review the circuit court's decision, terminating the garnishments in question, as one granting summary judgment, we must determine, given that there are no material facts in dispute, whether the circuit court's decision was "legally correct." *Heat & Power Corp. v. Air Prods. & Chems., Inc.,* 320 Md. 584, 591, 578 A.2d 1202 (1990).

## DISCUSSION

### I

Appellants contend that the circuit court erred in granting appellees' motions to terminate appellants' writs of garnishment. They claim that, under the terms of appellees' settlement agreement, "Atlas, CCS, [MPS] and PSI agreed to pay—and actually paid—the sum of $ 172,500.00 to New Panorama, or (for what amounts to exactly the same thing) to others on New Panorama's behalf." Those monies, they argue, were therefore subject to appellants' writs of garnishment.

Before considering whether the writs of garnishment were properly terminated, however, we must first address the question of whether appellants had a right to serve such writs on appellees in the first place. Appellees claim that appellants did not.

### Contingent Debts

Appellees maintain that a judgment debtor's contingent interest in property held by a third party is not subject to attachment. They argue that because "New Panorama's claims against CCS, PSI, MPS, and Atlas for damages arising out of the Pleasant Chase development project are uncertain and contingent at best," they are not attachable by garnishment. Although this argument was not presented below and "[o]rdinarily" we do not decide any issue "unless it plainly appears by the record to have been raised in or decided by the trial court," Md. Rule 8–131(a), we shall do so now for the guidance of that court, which no doubt will face this issue upon remand.

In support of their assertion that the claims in the case *sub judice* were contingent and therefore not attachable, appellees rely on *Fico v. Ghingher*, 287 Md. 150, 411 A.2d 430 (1980). In that case, the Court of Appeals held that although an "unmatured" interest is "subject to attachment" under Maryland's attachment statute, a "contingent" interest is not. *Id.* at 160, 411 A.2d 430. It distinguished between the two interests, stating that while an "unmatured interest exists when there is no question about the fact of the garnishee's liability, although the amount of that liability may be uncertain," a contingent interest "is one in which liability is not certain and absolute, but depends upon some independent event." *Id.*

The Court's ruling was consistent with its earlier decision in *Belcher v. Government Employees Ins. Co.*, 282 Md. 718, 387 A.2d 770 (1978), and with Courts and Judicial Proceedings ("CJP") § 3–305 of the Maryland Code Annotated (1973, 1998 Repl.Vol.). In *Belcher*, the Court stated that it is a "long—established principle that where an interest is uncertain and contingent—in that it may never become due and payable—it is not subject to attachment as not within the scope of Maryland's attachment statute." *Belcher*, 282 Md. at 723, 387 A.2d 770. (citing *Fairfax v. Savings Bank*, 175 Md. 136, 141, 199 A. 872 (1938); *Safe D. & T. Co. v. Ind. Brewing Ass'n*, 127

Md. 463, 468–69, 96 A. 617 (1916); *Suskin & Berry v. Rumley*, 37 F.2d 304, 306 (4th Cir.1930)). And CJP § 3–305, according to the *Belcher* Court, stands for the same principle, as by its silence, it excludes contingent interests. It states that "[a]n attachment may be issued against any property or credit, matured or unmatured, which belongs to a debtor," but makes no mention of a contingent interest in property. CJP § 3–305. It is "obvious," the *Belcher* Court observed, that because "that section provides for the attachment of unmatured interests without any mention of those which are contingent," the legislature did not intend for such interests to be susceptible to attachment. *Belcher*, 282 Md. at 724 n. 3, 387 A.2d 770.

After the *Fico* and *Belcher* decisions, however, the Court of Appeals adopted Maryland Rule 2–645, which governs the garnishment of any property of a judgment debtor other than wages and certain partnership interests. Md. Rule 2–645(a). That rule provides that garnishable property "includes any debt owed to the judgment debtor, whether immediately payable, unmatured, or *contingent*." *Id.* (emphasis added). In other words, notwithstanding the *Fico* and *Belcher* decisions and the limiting language of CJP § 3–305, Maryland Rule 2–645(a) expressly provides that contingent debts are attachable. But does that rule supersede all statutory and case law to the contrary? To answer that question, we must examine the relationship between these conflicting authorities. Our examination of this antinomy starts with the Maryland Constitution, the bedrock of Maryland law.

"The Constitution of Maryland, in Sec. 18A of Art. IV, authorizes and directs the Court of Appeals from time to time to 'make rules and regulations to regulate and revise the practice and procedure in that Court and in the other courts of this State, which shall have the force of law until rescinded, changed or modified by the Court of Appeals or otherwise by law.'" *Hensley v. Bethesda Sheet Metal Co.*, 230 Md. 556, 558, 188 A.2d 290 (1963). "The Court of Appeals exercises its rule-making authority," conferred by Maryland's Constitution, "upon the recommendations of the Standing Committee on the Rules of Practice and Procedure, which was established in

1946." J.A. Lynch, Jr. & R.W. Bourne, MODERN MARYLAND CIVIL PROCEDURE § 1.1 at 2 (2000).

In *Johnson v. Swann*, 314 Md. 285, 550 A.2d 703 (1988), the Court of Appeals addressed the interplay between the Maryland Rules adopted by the Court of Appeals and legislative enactments. The Court noted that Maryland Rules adopted by the Court of Appeals " 'have the force of law,' " *Johnson*, 314 Md. at 289, 550 A.2d 703 (quoting Section 18 of Article IV of the Maryland Constitution), and "generally apply despite a prior statute to the contrary and until a subsequent statute would repeal or modify the rule." *Id.* (citing *County Fed. S. & L. Ass'n v. Equitable S. & L. Ass'n*, 261 Md. 246, 253, 274 A.2d 363 (1971)).

CJP § 3–305 was enacted before Maryland Rule 2–645 was adopted. And given that the "contingency" language of Maryland Rule 2–645 was adopted by the Court of Appeals in 1984, subsequent to its decisions holding that contingent interests are not attachable, we conclude that Rule 2–645 overrides CJP § 3–305 to the extent that there is any conflict between the two and overrules any prior judicial holdings that contingent debts are not attachable. Accordingly, pursuant to Maryland Rule 2–645, "contingent" debts are attachable by garnishment in Maryland.

## Maryland Rule 2–645

▮ Having concluded that contingent debts are attachable under Maryland law, we must decide whether New Panorama's claims are contingent debts under Maryland Rule 2–645. To answer that question, we are required to construe that part of the rule. To do so, we employ the same principles that we use to interpret statutes. *In re: Mark M.*, 365 Md. 687, 711, 782 A.2d 332 (2001).

▮ "When construing a rule," just as we do when construing a statute, "we must first look to the words of the rule, giving them their ordinary and natural meaning." *In re Victor B.*, 336 Md. 85, 94, 646 A.2d 1012 (1994). "If the words of the rule are clear and unambiguous, our analysis ordinarily

ends." *Id.* If the rule's words are ambiguous, however, "we must look toward other sources to glean the intent of the rule." *Id.* Moreover, we must remember that "the General Assembly in enacting legislation does so with a full knowledge as to prior and existing law and judicial decisions with respect to such law." *Criminal Injuries Compensation Bd. v. Gould,* 273 Md. 486, 498, 331 A.2d 55 (1975). With these principles in mind, we turn to the task of interpreting Rule 2–645.

Under Rule 2–645(a), as noted, garnishable property includes "contingent" debts owed to a judgment debtor. Unfortunately, the Rule provides little guidance as to what constitutes a "contingent" debt. Nor is the meaning of that term so plain and unambiguous that we need go no further. Indeed, we must "look toward other sources to glean the intent of [that] rule." *In re Victor B.,* 336 Md. at 94, 646 A.2d 1012.

The notes of the Standing Committee on the Rules of Practice and Procedure, which created that Rule, state that one committee member defined "contingent" to include situations "where the debtor is a plaintiff in a personal injury case and garnishment is laid in the hands of the defendant insurance company." Comments of Mr. Lombardi, Minutes, Apr. 16, 1982, at 22–23. Another committee member, however, "commented that a contingent debt is simply one for an ascertainable amount but for which there is no definite due date." Comments of Mr. Sykes, Minutes, Apr. 16, 1982, at 22. In light of these comments, it has been noted that "[t]he scope of the contingency intended to be covered is hazy." COMMENTARY ON THE NEW MARYLAND RULES OF CIVIL PROCEDURE, 43 Md. L.Rev. 669, 853 n. 1194 (1984).

But the haze lifts when we recall that just as "the General Assembly in enacting legislation does so with a full knowledge as to prior and existing law and judicial decisions," *Gould,* 273 Md. at 498, 331 A.2d 55, so does the Court of Appeals, in adopting rules, including of course Maryland Rule 2–645. Having defined a "contingent" interest in both *Fico* and *Belcher* as "one in which liability is not certain and absolute, but depends upon some independent event," *Fico,*

287 Md. at 160, 411 A.2d 430; *Belcher,* 282 Md. at 724 n. 3, 387 A.2d 770, the court, we must assume in the absence any authority to the contrary, intended that definition to apply to the same term when used by the Court in other contexts, including Maryland Rule 2–645.

The debts in the case *sub judice,* however, are not only contingent but "unmatured" in that the amount of liability of each garnishee is uncertain but "definitely ascertainable in the future" upon settlement or entry of judgment. That of course does not effect the garnishability of those debts. As the Court of Appeals observed in *Fico,* so long as " 'the amount of the liability is capable of definite ascertainment in the future,' " it is subject to attachment by garnishment. *Fico,* 287 Md. at 161, 411 A.2d 430 (quoting *Javorek v. Superior Court of Monterey County,* 17 Cal.3d 629, 131 Cal.Rptr. 768, 552 P.2d 728, 737 (1976)) (citations omitted). Consequently, the contingent and unmatured debts owed New Panorama by CCS, PSI, MPS, and Atlas are attachable by garnishment. The next question is "What effect does appellees' settlement agreement have on these debts and thus appellants' writs of garnishment?"

### Termination of Writs

We shall now address the termination of each writ of garnishment, beginning with those served on CCS, PSI, and Atlas. The writs of garnishment served on those three entities directed them to "hold the property of the judgment debtor" at the time that they paid monies into the settlement fund. To settle New Panorama's lawsuits against them and all outstanding cross and counter-claims, they agreed to pay monies into a settlement fund, which would be used to pay New Panorama's attorney's fees and monies it allegedly owed CCS. Although the settlement monies did not go directly to New Panorama, they remained under its control (as it could compel the distribution of funds in accordance with the settlement agreement) and were to be used to satisfy its debts. Those monies were attachable by garnishment and their transfer to a settlement fund did not, under the circumstances,

alter that status. Thus, the circuit court erred by terminating the writs of garnishment served upon CCS, PSI, and Atlas.

Unlike the writs of garnishment served on CCS, PSI, and Atlas, however, the writ of garnishment served on MPS was not issued until two months after MPS had executed the settlement agreement. According to that agreement, MPS was to pay its contribution to the settlement fund "immediately upon execution of this Settlement Agreement." If MPS paid monies into the settlement fund before being served with the writ, those monies were not subject to that writ as the money was no longer in the possession of MPS and the circuit properly dismissed that writ. But if MPS paid monies into the settlement fund after being served with the writ directing it to "hold the property of the judgment debtor," those monies were subject to appellants' writ and that writ should not have been dismissed. The question of when those monies were paid is of course a factual determination and must be left to the circuit court to resolve upon a remand of this case, which, as we shall see, may not be necessary if the agreement, in accordance with its terms, is declared void *ab initio* by that court.

We can, however, be more definitive as to the writ of garnishment served upon appellee Kotz, the escrow agent. That writ was erroneously terminated because Kotz, as escrow agent, holds funds contributed by CCS, PSI and Atlas that for all intents and purposes are New Panorama's and thus subject to appellants' writs of garnishment.

We reach a different conclusion as to the writ served on McCartney, New Panorama's attorney. Unlike Atlas, CCS, PSI, and MPS, McCartney owed no debt to New Panorama, contingent or otherwise. Unlike Kotz, he did not have any of New Panorama's property in his possession at the time that the writ of garnishment that had been served on him was terminated. Nor had he transferred any monies owed New Panorama to a settlement fund, as did Atlas, CCS, PSI, and MPS. In sum, the writ of garnishment that was served on McCartney was properly terminated by the circuit court.

This does not necessarily mean that McCartney is entitled to the settlement funds that are earmarked for him under the settlement agreement. Although he may have a common law retaining lien [7] on any monies that come into his possession; for the reasons outlined in the next section of this opinion, he has no statutory lien on any of the money that is either in his possession or in the settlement fund.

Moreover, there is a dispute between the parties as to whether the monies earmarked for McCartney exceed the amount owed him under his retainer agreement with New Panorama. In the event they do and are nonetheless paid to McCartney, the excess amount may be subject to garnishment as a fraudulent conveyance under Commercial Law ("CL") § 15–209(a)(2) of the Maryland Code Annotated (1975, 2000 Repl.Vol.). *See Catholic Univ.*, 139 Md.App. at 295, 775 A.2d 458 ("[I]f a conveyance is fraudulent as to a creditor whose claim has matured, 'the creditor, as against any person except a purchaser for fair consideration, without knowledge of the fraud at the time of the purchase or one who has derived title immediately or immediately from such a purchaser, may ... [l]evy on or garnish the property conveyed as if the conveyance were not made.' " (Quoting CL § 15–209(a)(2))).

### Attorney's Statutory Lien

McCartney's claim that he was entitled to a portion of the settlement funds pursuant to an attorney's lien is no more meritorious than New Panorama's claim that the settlement funds were not in reality its funds. Appellants contend, and we agree, that because an attorney's lien under Business Occupations and Professions ("BOP") § 10–501 of the Mary-

---

7. An attorney has a retaining lien

on all papers, securities and money belonging to his client which come into his possession in the course of his professional employment. This is a general lien which gives him the right to retain such things until all his charges against his client are paid. As the name implies, it is dependant upon possession. It is, generally speaking, a passive lien and cannot be actively enforced either at law or in equity. *Diamond v. Diamond*, 298 Md. 24, 34–35, 467 A.2d 510 (1983)(quoting *Ashman v. Shecter*, 196 Md. 168, 173–74, 76 A.2d 139 (1950)).

land Code Annotated (2000 Repl.Vol.), attaches only to a "judgment or award" whereas a settlement agreement is "a mere compromise of claims and, therefore, a contract between the parties," McCartney had no statutory attorney's lien on the settlement funds.

A statutory attorney's lien was created in Maryland by BOP § 10–501. It states:

(a) *In General.*—Subject to subsection (b) of this section, an attorney at law has a lien on:

(1) an action or proceeding of a client of the attorney at law from the time the action or proceeding begins; and

(2) a judgment or award that a client receives as a result of legal services that the attorney at law performs.

(b) *Limited to fee agreement.*—A lien under this section attaches only if, and to the extent that, under a specific agreement between an attorney at law and a client, the client owes the attorney at law a fee or other compensation for legal services that produced the judgment or award.

(c) *Subordination of lien.*—A lien under this section is subordinate only to:

(1) a prior lien for wages due to an employee of the client for work related to the judgment or award; or

(2) a lien for taxes that the client owes the State.

(d) *Execution.*—An attorney at law may retain property subject to a lien under this section and bring an action for execution under the lien only in accordance with rules that the Court of Appeals adopts.

BOP § 10–501.

In interpreting a statute, "[t]he cardinal rule of statutory interpretation is to ascertain and effectuate the intention of the legislature," *Oaks v. Connors,* 339 Md. 24, 35, 660 A.2d 423 (1995), and "[l]egislative intent must be sought first in the actual language of the statute." *Jones v. Hubbard,* 356 Md. 513, 526, 740 A.2d 1004 (1999). " 'Where the statutory language is plain and free from ambiguity, and expresses a

definite and simple meaning, courts normally do not look beyond the words of the statute to determine legislative intent.'" *Philip Morris Inc. v. Angeletti,* 358 Md. 689, 795, 752 A.2d 200 (2000) (quoting *State v. Bell,* 351 Md. 709, 718, 720 A.2d 311 (1998)). "We may, however, confirm the meaning reached by reference to the words of the statute by considering the purpose, goal or context of the statute." *Prince George's County v. Vieira,* 340 Md. 651, 658, 667 A.2d 898 (1995). " '[C]ontext may include related statutes, pertinent legislative history and 'other material that fairly bears on the fundamental issue of legislative purpose or goal....'" *Frost v. State,* 336 Md. 125, 138, 647 A.2d 106 (1994)(quoting *GEICO v. Insurance Comm'r,* 332 Md. 124, 132, 630 A.2d 713 (1993)) (internal citations omitted). In discerning legislative intent from the language of a statute, we "give the words their 'ordinary and popularly understood meaning.'" *Smiley v. State,* 138 Md.App. 709, 714, 773 A.2d 606 (2001)(quoting *Velez v. State,* 106 Md.App. 194, 207, 664 A.2d 387 (1995)). "Where the statutory language is plain and unambiguous, a court may neither add nor delete language so as to 'reflect an intent not evidenced in that language....'" *Chesapeake & Potomac Tel. Co. of Maryland v. Dir. of Fin. for Mayor and City Council of Baltimore,* 343 Md. 567, 579, 683 A.2d 512 (1996) (quoting *Condon v. State,* 332 Md. 481, 491, 632 A.2d 753 (1993)).

We find the language of BOP § 10–501 to be " 'plain and free from ambiguity.'" *Philip Morris Inc.,* 358 Md. at 795, 752 A.2d 200 (quoting *State v. Bell,* 351 Md. 709, 718, 720 A.2d 311 (1998)). The statute declares that an attorney has a lien on "(1) an action or proceeding ... from the time the action or proceeding begins; and (2) a judgment or award that a client receives as a result of legal services that the attorney at law performs." BOP § 10–501(a)(1) and (2). Subsection (a)(1) states when an attorney's lien attaches, while subsection (a)(2) indicates to what an attorney's lien attaches.

Under subsection (a)(1), a lien on an action or proceeding attaches when "the action or proceeding begins," and according to subsection (a)(2), that lien attaches to a "judgment or award" received by the client as a result of the attorney's

services. Consequently, although for purposes of priority, a lien under BOP § 10–501 attaches upon the commencement of an action or proceeding, it applies only to a "judgment or award" in that proceeding.

As the language of BOP § 10–501 is plain and unambiguous, we "may neither add nor delete language so as to 'reflect an intent not evidenced in that language.'" *Chesapeake & Potomac Tel. Co. of Maryland v. Dir. of Fin. for Mayor and City Council of Baltimore,* 343 Md. 567, 579, 683 A.2d 512 (1996) (quoting *Condon v. State,* 332 Md. 481, 491, 632 A.2d 753 (1993)). We therefore conclude that if the legislature had intended for the lien under BOP § 10–501 to attach to a settlement agreement, it would have so stated. Indeed, when we view this statute in the " '[c]ontext . . . [of] related statutes'" we reach the same conclusion. *Frost,* 336 Md. at 138, 647 A.2d 106 (quoting *GEICO v. Insurance Comm'r,* 332 Md. 124, 132, 630 A.2d 713 (1993)); *Vieira,* 340 Md. at 658, 667 A.2d 898.

In CL § 16–601(a), for example, the legislature provided "[a] hospital which furnishes medical or other services to a patient injured in an accident not covered by the Maryland Workers' Compensation Act" with a lien "on 50 percent of the recovery or sum which the patient . . . collect[s] in judgment, *settlement,* or compromise of the patient's claim against another for damages on account of the injuries." (emphasis added). We therefore conclude that, if the legislature wanted to create a statutory lien for attorneys on settlements, it would have expressly done so as it did in CL § 16–601(a). As the legislature expressly provided that an attorney's lien would attach to "a judgment or award" and did not provide that it would attach to a settlement, McCartney's claim of a statutory lien on the settlement funds in this case is without merit. BOP § 10–501(a)(2).

Nor would it have mattered if the agreement had been "entered with the court." *Mitchell Properties, Inc. v. Real Estate Title Co. Inc.,* 62 Md.App. 473, 482, 490 A.2d 271 (1985). In that instance, "it is termed a settlement order," but

it "is not a court order." *Id.* It is just "a compromise between the parties, which they submit to the court to stay the proceedings in the case." *Id.* at 482–83, 490 A.2d 271. But "[i]f the court reduces the settlement order to a money judgment, it becomes a final judgment to the extent the underlying agreement address [sic] the respective claims of the parties." *Id.* at 483, 490 A.2d 271. In *Jones, supra,* we explained that

> [w]hen parties agree to settlement terms in the presence of the court and ask the court to render a judgment based on that settlement agreement and the court renders a judgment on the settlement, the agreement becomes a final judgment. A court judgment makes the settlement agreement a judicial act. When parties endorse a judicial decree entered pursuant to a settlement agreement, "a critical element [is added] to [the] contractual act: judicial conclusiveness."

*Jones,* 356 Md. at 525, 740 A.2d 1004 (quoting *Kirsner v. Fleischmann,* 261 Md. 164, 170, 274 A.2d 339 (1971)). In that event, an attorney could claim a lien pursuant to BOP § 10–501 on the settlement proceeds.

There is no indication of course that that is what occurred here. In this case, the parties read the settlement agreement into the record on January 7, 1999. A written version of the agreement was later executed by the parties and that is where the matter now stands. It was never reduced to judgment. Accordingly, McCartney does not have an attorney's lien pursuant to BOP § 10–501 on any of the proceeds of appellees' settlement agreement.

## Settlement Agreement

Finally, according to the terms of appellees' settlement agreement, if "any court rules that the Settlement Funds or any portion thereof are subject to garnishment" by appellants, then the "settlement contemplated" by their agreement becomes "void *ab initio*" and the "parties ... resume their positions in the Litigation as if [the] Settlement Agreement were never entered into." The agreement further states that

if a court so rules, "any party who has deposited funds into the Escrow Account may, at its option, leave said funds in the Escrow Account pending an alternative resolution of the [New Panorama v. CCS case] or demand that the Escrow Agent refund said money." As we have concluded that at least a portion of the settlement funds are subject to appellants' writs of garnishment, the circuit court must determine on remand whether the settlement agreement has indeed been rendered void *ab initio,* if the issue is then in dispute.

## II

Appellants contend that they were entitled to intervene as a matter of right in New Panorama v. CCS. They claim that they "had a protectible [sic] interest" which was "not being represented" because "the settlement was specifically designed to avoid [their] judgment against New Panorama" and their "garnishment liens." The intervention was necessary, they assert, to afford them an opportunity "to stay the settlement, conduct discovery and contest the adequacy *vel non* of the settlement, particularly McCartney's purported lien." Moreover, New Panorama v. CCS was the proper forum, according to appellants, in which to challenge the attorney's lien.

Maryland Rule 2–214(a) governs intervention as of right and provides:

(a) **Of right.** Upon timely motion, a person shall be permitted to intervene in an action: ... (2) when the person claims an interest relating to the property or transaction that is the subject of the action, and the person is so situated that the disposition of the action may as a practical matter impair or impede the ability to protect that interest unless it is adequately represented by existing parties.

To establish a right of intervention, the prospective intervenor must satisfy four criteria:

1. the application for intervention must be timely;

2. the applicant must have an interest in the subject matter of the action;

3. the disposition of the action would at least potentially impair the applicant's ability to protect its interest; and

4. the applicant's interests must be inadequately represented by the existing parties.

*Chapman v. Kamara,* 356 Md. 426, 443, 739 A.2d 387 (1999) (quoting *Chapman v. Kamara,* 118 Md.App. 418, 427, 702 A.2d 977 (1997)). The "[f]ailure to satisfy any one of the four requirements is sufficient to warrant denial of a motion to intervene as of right." *Hartford Ins. Co. v. Birdsong,* 69 Md.App. 615, 622, 519 A.2d 219 (1987).

■■■ Appellants obviously did not have "an interest in the subject matter of" New Panorama v. CCS, which was failing roads at Pleasant Chase and who was responsible for that problem. Nor would a "disposition of the action potentially impair [appellants'] ability to protect its interests." During the settlement of New Panorama v. CCS, appellees filed motions to terminate appellants' garnishments in Simpson v. New Panorama, as required by Maryland Rule 2–645(b), because that was "the same action in which the judgment [for appellants] was entered." Observing that Simpson v. New Panorama was the proper forum in which to challenge appellants' writs of garnishment, and finding that appellants' "interests [would be] "adequately protected" there, the circuit court denied appellants' motion to intervene. We agree. The ability of appellants to protect their interests was not impaired by compelling appellants to raise whatever challenges they had to the settlement agreement and to McCartney's lien in the garnishment proceedings in Simpson v. New Panorama rather than in New Panorama v. CCS.

Appellants also claim, however, that the circuit court should have granted them permissive intervention because there were "questions of law and fact that all parties had in common" including "the existence and amount of [McCartney's] attorney's fee," the adequacy of the notice of McCartney's attorney's lien, and "the recovery of monies from appellees and proper payment of same."

Permissive intervention "lies within the sound discretion of the circuit court, and on appeal may be reviewed only for an abuse of that discretion." *Jabine v. Priola*, 45 Md.App. 218, 224–25, 412 A.2d 1277 (1980). It is warranted when "[u]pon timely motion ... [a] person's claim or defense has a question of law or fact in common with the action." Md. Rule 2–214(b)(1). In denying appellants' motion for permissive intervention, the circuit court found that appellant's claims had "no question of law or fact in common with the issues and facts in the C.C.S. case."

New Panorama v. CCS involved claims of negligence, professional liability, breach of warranty, and breach of contract arising from the road failures at Pleasant Chase. Nonetheless, appellants sought to intervene in that case for an entirely unrelated reason—to enforce their writs of garnishment by challenging the propriety of appellees' settlement agreement. We therefore conclude that the circuit court did not err in finding that appellants' claims had "no question of law or fact in common with the issues and facts in the C.C.S. case" for purposes of permissive intervention. Moreover, as previously noted, any interests that appellants have in the proceeds of the New Panorama v. CCS settlement agreement would be adequately protected in garnishment proceedings in Simpson v. New Panorama.

**JUDGMENT OF THE CIRCUIT COURT DENYING APPELLANTS' MOTION TO INTERVENE IS AFFIRMED. JUDGMENT OF THE CIRCUIT COURT DISMISSING APPELLANTS' WRITS OF GARNISHMENT AS TO CCS, PSI, ATLAS, MPS, AND KOTZ IS REVERSED. JUDGMENT OF THE CIRCUIT COURT DISMISSING APPELLANTS' WRIT OF GARNISHMENT SERVED ON McCARTNEY IS AFFIRMED. CASE REMANDED FOR FURTHER PROCEEDINGS. COSTS TO BE PAID BY APPELLEES.**