813 A.2d 260

CONSOLIDATED CONSTRUCTION SERVICES, INC. et al.,

v.

Robert C. SIMPSON et al.

No. 35, Sept. Term, 2002.

Court of Appeals of Maryland.

Dec. 23, 2002.

436

Jeffrey M. Kotz (Kandel, Klitenic, Kotz, Betten & Chernow, LLP, on brief), Towson, for petitioners.

Douglas A. Rubel (Douglas A. Rubel, PLLC, Cary, NC; Roger A. Hayden, II, of Pasternak & Fidis, P.C., Bethesda), all on brief, for respondents.

Argued before BELL, C.J., and ELDRIDGE, RAKER, WILNER, CATHELL, HARRELL and BATTAGLIA, JJ.

CATHELL, Judge.

This case arises out of several cases involving the development of a Howard County residential community, "Pleasant Chase." On January 5, 1996, New Panorama Development Corporation ("New Panorama"), a developer, filed suit against Consolidated Construction Services, Inc. (CCS), a contractor, for various claims, including a claim for damages, involving CCS's installation of sewers and water lines in the Pleasant Chase development. Soon thereafter, New Panorama also filed suit for damages against several sub-contractors, including Atlas Plumbing and Mechanical, Inc. (Atlas), Maryland Paving and Sealant, Inc. (MPS) and Professional Service Industries, Inc. (PSI). All of these claims were consolidated into one case, hereinafter *"New Panorama v. CCS."* The parties involved filed numerous cross-claims, counter-claims and third party claims.

In August 1996, Robert C. Simpson, et. al., respondents, filed suit against New Panorama[1] for defaulting on a mortgage for the purchase of the Pleasant Chase property. On

---

1. This litigation will hereinafter be referred to as *"Simpson v. New Panorama."*

February 20, 1997, respondents obtained a judgment against New Panorama. Respondents then served writs of garnishment on several companies and individuals, including CCS, Atlas, MPS, PSI, Donald J. McCartney and Jeffrey M. Kotz.[2] These entities and persons, together with New Panorama, are petitioners in the case *sub judice.*

On January 7, 1999, petitioners entered the terms of a settlement agreement into the record of the *New Panorama v. CCS* litigation and later executed that agreement between June and September of 1999. On May 12, 1999, respondents filed a Motion to Intervene and a Motion to Enforce Garnishments in the *New Panorama v. CCS* litigation; both motions were denied by order on September 21, 1999. An appeal of that order was stayed pending the outcome of the garnishment issues in the *Simpson v. New Panorama* litigation.

On January 13, 2000, Atlas, CCS, MPS, PSI and Kotz filed a Motion to Terminate Garnishments in the *Simpson v. New Panorama* litigation. McCartney subsequently filed a Motion to Terminate Garnishment on March 24, 2000. The Circuit Court held a hearing on April 14, 2000 and entered on order terminating the garnishments on May 1, 2000. Respondents filed a timely appeal. The Court of Special Appeals then consolidated this appeal with respondents' appeal in the *New Panorama v. CCS* litigation.

On February 6, 2002, the Court of Special Appeals affirmed the trial court's denial of respondents' Motion to Intervene in the *New Panorama v. CCS* litigation. *Simpson v. Consol. Constr. Serv., Inc.,* 143 Md.App. 606, 795 A.2d 754 (2002). That court affirmed in part and reversed in part in reference to the trial court's dismissal of respondents' garnishments, and

---

**2.** Writs of garnishment were not immediately filed against MPS, Kotz and McCartney; these writs were not filed until after a settlement agreement in the *New Panorama v. CCS* litigation was created, discussed *infra.* McCartney was New Panorama's attorney in the *New Panorama v. CCS* litigation and Kotz is the escrow agent for the settlement fund created by the settlement agreement in the *New Panorama v. CCS* litigation.

then remanded the case for further proceedings.[3]  On May 1, 2002, petitioners filed a Petition for Writ of Certiorari with this Court.  On May 20, 2002, respondents filed an Opposition to Petition for Writ of Certiorari.  On June 20, 2002, we granted the petition.  *Consolidated v. Simpson,* 369 Md. 570, 801 A.2d 1031 (2002).  Petitioners present two questions for our review:

"1.  Whether funds generated by a settlement agreement between multiple parties are subject to garnishment by a judgment creditor of one of the parties, where that judgment debtor does not contribute to or receive any funds under the settlement agreement?

"2.  Whether Section 10–501 of Maryland's Business Occupations and Professions Article provides an attorney's lien on funds generated by a pretrial settlement agreement?"

We answer in the negative to petitioners' questions.  We hold that respondents' writs of garnishment are not valid and that McCartney did not have a statutory attorney's lien on the settlement funds.

## I.  Facts

New Panorama is a developer of land for residential homes. New Panorama generally purchases a parcel of land, prepares a site plan, obtains the necessary development permits, installs lines for water, sewer and storm drainage, builds roads and later sells the finished lots to builders.  In 1992, New Panorama purchased land in Howard County from respondents [4] with plans to develop it into a residential community to be known as Pleasant Chase.  New Panorama signed a mortgage with respondents, which required an initial down pay-

---

3.  The Court of Special Appeals determined that the writs served on CCS, PSI, Atlas and Kotz were valid, thus reversing the trial court on that issue.  That court affirmed the trial court's dismissal of the writ served upon McCartney and remanded the matter concerning the writ served upon MPS, directing the trial court to make a factual determination concerning the exact time in which MPS paid monies into the settlement fund.  Additionally, that court found that McCartney did not have an attorney's lien on the settlement fund.

4.  New Panorama signed a mortgage agreement for the purchase of Pleasant Chase with Mr. Robert Simpson, who owned an interest in the

ment and subsequent monthly payments to respondents until the entire balance was paid. After New Panorama failed to make those payments, respondents filed suit in Howard County Circuit Court against New Panorama alleging that New Panorama had defaulted under the mortgage used to purchase Pleasant Chase.

Before its default on its mortgage with respondents, New Panorama entered into a contract with CCS for CCS to dig trenches for water, sewer and storm drainage lines, install the lines and complete other utility work in the Pleasant Chase community. PSI was the engineering firm hired by New Panorama to test the soil, *i.e.*, to monitor and test the areas surrounding the community's utilities to ensure the proper compaction of the backfill prior to the construction of the community's roads. MPA was hired to pave the roads. Atlas, a sub-contractor hired by Lovell Regency, a residential builder, was hired to connect the individual homes to the water and sewer lines and otherwise complete the plumbing work. Within a few months, the paved roads within Pleasant Chase began to settle and rupture, thus causing considerable damage rendering the roads in need of extensive repair.

New Panorama retained McCartney in reference to possible claims arising out of the damage to the roads. In 1996, after a dispute over who was responsible for the road damage, New Panorama filed separate suits claiming damages against CCS and the sub-contractors.[5] There was a third party claim,[6]

---

land and was the personal representative of the estates of Julia V. Simpson and Willis E. Simpson. As Robert Simpson is now deceased, the trustees of his estate and the new personal representatives of the other Simpson estates are collectively respondents.

5. On January 5, 1996, New Panorama filed suit against CCS for breach of contract, breach of warranty and attorney's fees. The next day it filed suit against PSI for breaches of contract and warranty, malpractice and negligence, as well as filing a negligence suit against Atlas. A suit was also filed against MPS, but the details of that suit were omitted from the record extract.

6. CCS filed this third party claim, and PSI filed a cross-claim, against International Fidelity Insurance Company (IFIC). IFIC had issued

along with several counter-claims and cross-claims,[7] filed, which led to the suits being consolidated in early 1997.[8]

As indicated *supra,* subsequent to the initiation of the *New Panorama v. CCS* litigation, respondents obtained a judgment, arising out of a default under the terms of the original mortgage on the property, against New Panorama in the Circuit Court of Howard County in the amount of $791,897.80. Seeking enforcement of that judgment, respondents subsequently served writs of garnishment on CCS, PSI and Atlas to garnish any money that they owed to New Panorama.

In 1999, after three years of litigation and after the writs of garnishment had been served, McCartney and Kotz[9] and the parties to the *New Panorama v. CCS* litigation, including New Panorama, PSI, CCS, IFIC, MPS and Atlas, devised a settlement agreement, entitled "Settlement Agreement, Mutual Release and Escrow Agreement," to dispose of all current cross and counter-claims, as well as any future claims arising out of the Pleasant Chase project. The agreement was read into the record on January 7, 1999, but was not executed by the parties until between June and September of 1999. The Court of Special Appeals discussed the terms of the settlement agreement as follows:

---

payment and performance bonds on behalf of New Panorama for Pleasant Chase.

7. CCS and PSI filed counter-claims against New Panorama alleging a failure to pay those contractors for services rendered. MPS filed a similar counter-claim alleging a failure by New Panorama to provide MPS with a suitably prepared site, thus precluding MPS from completing its work on Pleasant Chase.

All of the contractors except CCS filed cross-claims against the other contractors alleging negligence and breach of contract. PSI also filed a cross-claim against MPS and Atlas seeking indemnification and contribution in the event that PSI was found to be liable to New Panorama.

8. Again, we will refer to these consolidated suits as *"New Panorama v. CCS."*

9. The agreement named Kotz as escrow agent for the settlement funds.

"In the agreement, the parties stated that it was their 'intention and desire' to 'resolve any disputes' among them relating to the Pleasant Chase development 'by paying CCS $77,500 plus interest in satisfaction of its counter-claim, third party claim, and indemnity claim,' although CCS had not yet brought an indemnity claim. They further stated that '[f]or purposes of this Settlement Agreement ... PSI, MPS, and Atlas concede that CCS would have the right to institute a claim against them for indemnity, contribution, and/or negligence ... with respect to damages that could conceivably be awarded in favor of New Panorama against CCS and paid by CCS as a result of the Litigation.'

The agreement also provided that McCartney would be paid '$95,000 plus interest in satisfaction of his attorney's lien,' stating that McCartney had served 'written notice of his lien ... established pursuant to § 10–501 of the Business Occupations and Professions Article, Annotated Code of Maryland, and Rule 2–652(b) of the Maryland Rules of Civil Procedure' upon all parties to the settlement agreement for legal services he had rendered in *New Panorama v. CCS.* According to the settlement agreement, McCartney's lien was for 'fees, expenses, costs and other compensation ... in the amount of one-third of the gross amount of any recovery or actual attorney's fees, whichever is greater.'

To generate the funds to be paid to CCS and McCartney, the settlement agreement required that, upon execution, Kotz, as escrow agent of the settlement fund, be paid $75,000.00 by PSI, $47,500.00 by the insurance company for CCS, $45,000.00 by the insurance company for MPS, and $5,000.00 by the insurance company for Atlas. The settlement agreement stated that 'New Panorama [did] not have any legal or equitable interest in the Settlement Funds,' but did have the right 'to compel the disbursement [of the funds] by the Escrow Agent in accordance with [the] Settlement Agreement.'

The settlement agreement also declared that it was 'contingent upon the termination of ... [respondents'] garnishments.' It specified that Kotz could neither distribute the

settlement funds nor file a stipulation of dismissal until, among other things, he had received a court order 'dismissing with prejudice ... [respondents'] garnishments' and until that order had become final after 'the conclusion of all appellate review thereof and further proceedings on remand.'

The settlement agreement also stated that 'in the event that any court rules that the Settlement Funds or any portion thereof are subject to garnishment by ... [respondents] ... the settlement contemplated herein shall be deemed null and void *ab initio,* and the parties shall resume their positions in the Litigation as if [the] Settlement Agreement were never entered into.' If that occurred, 'any party who ha[d] deposited funds into the Escrow Account may, at its option, leave said funds in the Escrow Account pending an alternative resolution of the [*New Panorama v. CCS* case] or demand that the Escrow Agent refund said money.' "

*Simpson,* 143 Md.App. at 616–18, 795 A.2d at 760 (some alterations added).

As a result of that agreement, no money would physically enter the possession of New Panorama, thereby, the parties hoped, avoiding the respondents' garnishment claims. Respondents subsequently filed a motion to intervene,[10] a motion to enforce garnishments in the *New Panorama v. CCS* litigation and served writs of garnishment on MPS, Kotz and McCartney. The Circuit Court denied both motions and dismissed all garnishments. Respondents appealed to the Court of Special Appeals.

The Court of Special Appeals affirmed in part and reversed in part with reference to the trial court's dismissal of respondents' garnishments, and then remanded the case for further proceedings. The court reversed as to the trial court's dismissal of the writs of garnishment served on CCS, PSI, Atlas

---

**10.** The Circuit Court denied, and the Court of Special Appeals affirmed the denial of, this motion to intervene. As this issue was not raised on Writ of Certiorari to this Court, we shall not review it.

and Kotz. The dismissal of the garnishment on McCartney was affirmed and the denial of the garnishment on MPS was remanded for further factual inquiry, as mentioned *supra*, in footnote 3. The Court of Special Appeals also determined that McCartney did not have a valid statutory attorney's lien on the settlement fund and that the settlement fund was the property of New Panorama, thus garnishable with respect to the remaining petitioners. Essentially, the Court of Special Appeals held that:

"Although the settlement monies did not go directly to New Panorama, they remained under its control (as it could compel the distribution of funds in accordance with the settlement agreement) and were to be used to satisfy its debts. Those monies were attachable by garnishment and their transfer to a settlement fund did not, under the circumstances, alter that status." *Id.* at 627–28, 795 A.2d at 766.

Petitioner appeals to this Court from that decision.

## II. Discussion

In the very recent case of *Bragunier Masonry Contractors, Inc. v. The Catholic University of America*, 368 Md. 608, 796 A.2d 744 (2002), this Court set out the nature and grounds of garnishment as a remedy:

" '[g]arnishment is a remedy created and controlled by statute.' *Bragunier*, 139 Md.App. at 293, 775 A.2d at 467. *See Mears v. Adreon*, 31 Md. 229, 237 (1869) (stating that proceedings under attachment are a special remedy conferred by statute); *Chromacolour Labs Inc. v. Snider Bros. Property Management, Inc.*, 66 Md.App. 320, 503 A.2d 1365 (1986) (noting that garnishment is a statutory proceeding). In *Northwestern National Insurance Co. v. William G. Wetherall, Inc.*, 267 Md. 378, 384, 298 A.2d 1, 5 (1972), we stated:

'An attachment by way of garnishment issued after judgment is a mode of execution and its function is approximately the same as that of a writ of *fieri facias*. As attachment proceedings are in derogation of the common

law, their existence is dependant upon special provisions authorizing them. Authority for courts in this State to entertain attachments after judgment has long been established in our laws . . . .'

"Recently, this Court, in *Parkville Federal Savings Bank v. Maryland National Bank,* 343 Md. 412, 681 A.2d 521 (1996) discussed the well-established nature and function of a garnishment proceeding. We stated:

'A writ of garnishment is a means of enforcing a judgment. It allows a judgment creditor to recover property owned by the debtor but held by a third party. . . .

"A garnishment proceeding is, in essence, an action by the judgment debtor for the benefit of the judgment creditor which is brought against a third party, the garnishee, who holds the assets of the judgment debtor. An attaching judgment creditor is subrogated to the rights of the judgment debtor and can recover only by the same right and to the same extent that the judgment debtor might recover." '

*Id.* at 418, 681 A.2d at 524 (citing *Fico, Inc. v. Ghingher,* 287 Md. 150, 159, 411 A.2d 430, 436 (1980) (citations omitted)). *See Hoffman Chevrolet, Inc. v. Washington County Nat'l Sav. Bank,* 297 Md. 691, 696, 467 A.2d 758, 761 (1983); *Northwestern Nat'l Ins. Co.,* 267 Md. at 384, 298 A.2d at 5; *Walsh v. Lewis Swim. Pool Constr. Co.,* 256 Md. 608, 610, 261 A.2d 475, 476 (1970); *Peninsula Ins. Co. v. Houser,* 248 Md. 714, 717, 238 A.2d 95, 97 (1968); *Messall v. Suburban Trust Co.,* 244 Md. 502, 506–07, 224 A.2d 419, 421 (1966); *Cole v. Randall Park Holding Co.,* 201 Md. 616, 623–24, 95 A.2d 273, 277 (1953). The opinions of this Court have emphasized the principle, growing out of the nature and function of a garnishment proceeding, that the creditor merely steps into the shoes of the debtor and can only recover to the same extent as could the debtor."

*Id.* at 621–23, 796 A.2d at 751–52 (some citations omitted).

The test of liability of the garnishee to the judgment creditor is "whether the garnishee has any funds, property or

*credits* which belong to the judgment debtor." *Fico, Inc. v. Ghingher,* 287 Md. 150, 159, 411 A.2d 430, 436 (1980) (citing *Northwestern Nat'l Ins. Co. v. Wetherall,* 267 Md. 378, 384, 298 A.2d 1, 5 (1972)) (emphasis added). *See also Walsh v. Lewis Swim. Pool Constr. Co., Inc.,* 256 Md. 608, 610, 261 A.2d 475, 476 (1970). The burden of proof rests with the garnishing creditor and to recover, that creditor "must present evidence legally sufficient to prove a liability of ... [the garnishee] which existed when the writ was issued or when the case was tried." *Walsh,* 256 Md. at 610, 261 A.2d at 476 (citing *Cueva Co. v. Williams & Co.,* 145 Md. 526, 530, 125 A. 849 (1924)).

Attachment of property in Maryland is governed by two main authorities: Section 3–305 of the Courts & Judicial Proceedings Article of the Maryland Code and Maryland Rule 2–645. Section 3–305, entitled "Property or credits of debtor subject to attachment," states that "[a]n attachment may be issued against any property or credit, matured or unmatured, which belong to a debtor." Md.Code (1973, 1998 Repl.Vol.) § 3–305 of the Courts & Judicial Proceedings Article. Maryland Rule 2–645(a) states:

> "(a) **Availability.** This Rule governs garnishment of any property of the judgment debtor, other than wages subject to Rule 2–646 and a partnership interest subject to a charging order, in the hands of a third person for the purpose of satisfying a money judgment. Property includes any debt owed to the judgment debtor, whether immediately payable, unmatured, or contingent."

The case *sub judice* presents this Court with the issue of whether monies held in a settlement fund pursuant to certain settlement conditions, created through litigation between a judgment debtor and garnishees, can be the property, for garnishment purposes, of a judgment debtor and thus garnishable by the judgment debtor's judgment creditor when the judgment debtor does not directly contribute to, nor would it receive directly, any of said funds. We hold these funds represent an attempt to settle contingent obligations and

interests and, as we shall explain, are not garnishable under Maryland law.

■ The apparent test under the language of the applicable rule as to whether the settlement funds are the property of New Panorama and thus garnishable by its judgment creditor, is whether the property is "any debt owed to the judgment debtor, whether immediately payable, unmatured, or contingent." Md. Rule 2–645. The plain language of this Rule suggests a broad interpretation. Property, as defined by *Black's Law Dictionary* 1216 (Henry C. Black ed., 6th ed., West 1998), is "the unrestricted and exclusive right to a thing; the right to dispose of a thing in every legal way, to possess it, to use it, and to exclude everyone else from interfering with it." This Court, however, has not previously defined property within the context of the facts of the case *sub judice.*

As we have indicated the applicable statute, Maryland Code, Court and Judicial Proceedings Article, Section 3–305, provides for attachments "against any property or credit, matured or unmatured." The rule this Court adopted during a extensive re-codification of rules in 1982 provides as we have indicated in relevant part, "Property includes any debt owed to the judgment debtor, whether immediately payable, unmatured, or contingent." As is readily clear our rule adds the term "contingent." It is upon this word that Respondents relied and also upon which the Court of Special Appeals relied. The Respondent proffered, and the lower intermediate court agreed, that the word "contingent" added another class of property that could be subject to attachment by way of garnishment. In doing so the court erred. It added as garnishable objects things that might never be due in the first instance to the debtor.

■ A matured debt is one in which the sum is certain and is due, i.e. matured. An unmatured debt is one in which the sum is certain *and* the time for payment of the debt has not yet occurred. Generally, a contingent sum is no more than a possibility that a presently unascertainable sum might possibly be owed to the debtor from the person sought to be

garnished at some future time. The addition of the term "contingent" was a substantive change by our Rule to the otherwise limiting language of a statutory cause of action. It was improper for us to do so.

We noted in *Northwestern National Insurance Company v. William G. Wetherall, Inc.*, 267 Md. 378, 384, 298 A.2d 1, 5 (1972), that: "An attachment by way of garnishment issued after a judgment is a mode of execution and its function is approximately the same as that of a writ of *fieri facias*. As attachment proceedings are in derogation of the common law, their existence is dependent upon special provisions authorizing them." Those special provisions are now found in Maryland Code, Courts and Judicial Proceedings Article, Section 3–305. Garnishment actions are, as we have said, statutory actions.

Our rule making authority is contained in Article IV, Section 18 of the Maryland Constitution. It provides, as here relevant: "(a) The Court of Appeals from time to time shall adopt rules and regulations *concerning the practice and procedure* in and the administration of the appellate courts and in the other courts . . . ." (emphasis added). Additionally Article 8 of the Maryland Declaration of Rights provides: "That the Legislative, Executive and Judicial powers of Government ought to be forever separate and distinct from each other; and no person exercising the functions of one of said Departments shall assume or discharge the duties of any other."

We noted in *Shell Oil Company v. Supervisor of Assessments of Prince George's County*, 276 Md. 36, 46, 343 A.2d 521, 527 (1975), that: "This Court has consistently stated that Article 8 prohibits the courts from performing non-judicial functions and prohibits administrative agencies from performing judicial functions."

We also recently again questioned the extent of this Court's rule making authority. In *State v. Kanaras*, 357 Md. 170, 183, 742 A.2d 508, 515–16 (1999), in respect to the issue of illegal sentences, we overruled *Valentine* and opined:

"As pointed out in the dissenting opinion in *Valentine,* 305 Md. at 123, 501 A.2d at 854, however,

> 'A motion to correct an illegal sentence is not a "statutory" remedy. Statutes are enacted by the General Assembly of Maryland. . . . Nonetheless, the fact that the Maryland Rules have the force of law does not mean that a rule is a statute.'

"Furthermore, the language of the Post Conviction Procedure Act obviously refers to separate common law or statutory causes of action, such as habeas corpus or coram nobis actions which are separate civil actions. It is doubtful that this Court's rule-making authority would extend to the creation of a separate cause of action."

■ We noted in *Sugarloaf Citizens' Association v. Department of the Environment,* 344 Md. 271, 289–90, 686 A.2d 605, 614–15 (1996): "Under . . . the separation of powers requirement . . . it is not the proper function of an administrative official . . . to decide whether a plaintiff . . . has standing to maintain an action in court." (footnote omitted). *See also Reyes v. Prince George's County,* 281 Md. 279, 295, 380 A.2d 12, 21 (1977), which states:

> "The other constitutional limitation which prohibits this Court, or indeed any Maryland court, from rendering such an [advisory] opinion to the legislature or executive flows from Article 8 of our Declaration of Rights, which mandates that the powers of the three departments of government be 'forever separate and distinct.' We have many times stated that Article 8 prohibits the courts from performing nonjudicial functions. Moreover, we have said that 'all judicial authority is only such as is provided for by Article 4 of the Maryland Constitution, and it has been decided that only judicial functions can be exercised which find their authority in that article. . . .' " [Citations omitted.] [Alteration added.]

*See also City of Baltimore v. Comptroller,* 292 Md. 293, 297–98, 439 A.2d 1095, 1096–97 (1982); *but cf., Steed Mortgage Co. v. Arthur,* 37 Md.App. 592, 603, 378 A.2d 690, 698 (1977)

(relating to court rules in respect to service of process in attachment cases stating, "As we see it, the rule establishes a preferential order of service.... Reason and common sense indicate that the preferential order ... adopted is no more than procedural."). As we have indicated the Constitution limits this Court's rule making power to matters of procedure and practice. It does not confer upon this Court the power to, by rule, add substantive elements to causes of action.

The potential problem of the Court's use of its rule making power to initiate substantive changes to causes of action was more recently pointed out in Judge Eldridge's dissent to the adoption of Maryland Rules Orders Adopting Rules of Practice and Procedure (2001), relating to constructive civil contempt. There Judge Eldridge, joined by Judge Bell, noted:

"Finally, I question the propriety of this Court utilizing its rule making authority to change the substantive law of civil contempt and abolish an affirmative defense in a large category of civil actions. Article IV, § 18, of the Maryland Constitution authorizes this Court to 'adopt rules and regulations concerning the practice and procedure in and the administration of the appellate courts and in the other courts of this State....' This provision has not previously been construed as authorizing the Court, by rule making, to change the substantive nature of civil causes of action.

. . .

"... In light of this, it is doubtful that changing the substantive law of civil contempt by abolishing an affirmative defense falls within this Court's rule making authority." Maryland Rules Orders at 47 (2001).

As we have indicated, attachment and garnishment proceedings are creatures of statute. As such the substance of the statute, so long as constitutional issues are not present, is the province of the Legislature and not the courts. The statute only permits the garnishment of matured and unmatured property or credits belonging to the garnishor's debtor. When we added contingent property or credits by rule, we

added a substantive element to a statutory cause of action. In doing so we exceeded our rule making authority.[11]

We have not discovered any comment by the Court at the time of the passage of the rules submission of which this rule was a part. We have, however, been able to examine the minutes of the Court of Appeals Standing Committee on Rules of Practice and Procedure (April 16, 1982) in their deliberations in respect to this matter. It appears that the committee did not completely contemplate the meaning of the word "contingent" in the context of attachment and garnishment proceedings. The minutes of April 16, 1982 in respect to the predecessor rule where the word "contingent" was first proposed, states in relevant part:

"Rule 2–668 was accompanied by the following explanatory note:

'This Rule has been redrafted with the intent of retaining the essence of current garnishment practice for use in the majority of cases and of making special provision for the few cases where controversy between the judgment creditor and garnishee requires the full panoply of a litigated action. The format of this Rule generally correlates with the pres-

---

11.  We note, specifically, that, so far as the record before us reflects, this issue was never raised by any of the parties to the case. Accordingly, it was not addressed by the lower courts. The parties presumed our rule to be valid. The amendment to the rule was part of the presentation to this court of a large revision in respect to several areas of the rules. The issue of the impact of the word "contingent" was neither specifically presented to us, nor addressed by us. This is, in so far as we can discern, the first time the issue is being addressed.

We initially considered having the parties present additional argument and additional briefing on this issue. Upon reflection, we were of the opinion that, irrespective of additional briefing and/or argument, we would have no choice but to acknowledge that by amending the rule in that fashion we had exceeded our authority. In that respect, under the circumstances here present, we would have no choice but to render the holding that we render even after any additional briefing and argument. We, thus, have decided to address the issue at this stage. To do otherwise, in our view, would only needlessly increase the costs to all of the parties.

We will refer this matter to the Rules Committee for its action consistent with this opinion.

ent procedure for garnishment of wages as provided in Rule F6. [Prior Rule F6 contained no provisions in respect to "contingent" property or credits.]

'Section (a) [the section where the word "contingent" is added] is new and is consistent with Rule G45a and the case law developed relative to that rule.' "

Prior Rule G45 provided: "(a) *Generally.* Any property, including a credit which has not matured and a debt due upon judgment belonging to the defendant . . . may be attached." The word "contingent" was not contained in that prior rule.

More importantly, the Courts and Judicial Article, Section 3–305, the statute then in effect provided, as the present statute does, that attachments could issue against "property or credit, matured or unmatured, which belong to a debtor." The word "contingent" was not a part of that prior statute.

In any event, the minutes continue and reflect the following: "The Chairman inquired as to the intended coverage accomplished by inclusion of the word 'contingent' in section (a). Mr . . . . commented that a contingent debt is simply one for an ascertainable amount but for which there is no definite due date." The minutes reflect that another member believed that the word "contingent" did include the situation where a personal injury plaintiff places a garnishment in the hands of a defendant's insurance company. Another member commented that the term was broad enough to include trust situations. Later, when the rule was being further considered, the minutes reflect the following:

"Judge . . . inquired as to the function to be served by the last sentence of section (a). Mr . . . . responded that the sentence provides a simple definition of an attachable debt; an unmatured debt cannot be accelerated but can be garnished. Mr . . . . asked if an unmatured debt can be forgiven by the debtor. Mr . . . . indicated that the debtor's right is curtailed by the garnishment of the debt."

It appears clear that the committee was not really recommending that contingent credits be garnishable but that unmatured debts could be. Its use of the word "contingent" was

not intended to cover the situation that exists in the case *sub judice* where the obligations of the various contractors, if any, were completely contingent on the ability of the developer to establish that obligations were due it in the first instance.

We lacked the power and authority to adopt such a provision. Accordingly, the garnishments laid in the hands of the subcontractors, contractors and the escrow agent were invalid. The property deposited into the settlement fund of the parties is not, for garnishment purposes, the property of New Panorama and cannot be garnished by its judgment creditors.

This Court, prior to the improper rule change discussed above, spoke to whether contingent debts were garnishable under § 3–305 of the Courts & Judicial Proceedings Article of the Md.Code. Our most recent case discussing contingent garnishments in this context is *Fico, Inc. v. Ghingher,* 287 Md. 150, 411 A.2d 430 (1980). In *Fico,* the question presented was:

> "whether an escrow fund, established under § 6–106(1) and held by a garnishee for the payment of creditors who were listed and given notice or who filed claims as required by § 6–104(1)(a) and § 6–105, may be attached by a judgment creditor who was not listed or given notice, and who did not file a claim." *Id.* at 155, 411 A.2d at 434.

There, Ungar Olds, Inc., the seller, agreed to sell its business and assets to Metro Olds, Inc., the buyer, in a transfer that qualified as a bulk transfer. At the request of the buyer, the seller produced a sworn list of all creditors to the buyer, which omitted Fico, Inc., the judgment creditor. The buyer established an escrow account with funds sufficient to pay all of the seller's listed creditors with disputed claims against the seller. The fund did not include funds that would satisfy Fico's claim. Fico filed an " 'Order for Attachment on Judgment,' " which was served on the garnishee, Ghingher, the escrow agent.

We held that Fico's attachment was valid as it was an unmatured, *not contingent,* interest, thus, making in that distinction a reaffirmation of the proposition of law established in *Belcher v. Government Employees Insurance Company,* 282 Md. 718, 723–24, 724 n. 3, 387 A.2d 770, 773–74, 774 n. 3

(1978), that while contingent interests were not attachable under § 3–305 of the Maryland Code, unmatured interests were attachable. In doing so, we said:

"In essence, the garnishee's basic contention is that the seller has only a contingent interest which cannot be attached. When an interest is uncertain and contingent, in that it may never become due and payable, it is not within the scope of Maryland's attachment statute and is not subject to attachment. A contingent interest is one in which liability is not certain and absolute, but depends upon some independent event. *Belcher*, 282 Md. at 723, 724 n. 3, 387 A.2d at 773, 774 n. 3. . . .

"An unmatured interest, however, is subject to attachment. § 3–301(b) and § 3–305 of the Courts and Judicial Proceedings Article. One type of unmatured interest exists when there is no question about the fact of the garnishee's liability, although the amount of that liability may be uncertain. *Belcher*, 282 Md. at 724 n. 3, 387 A.2d at 774 n. 3. . . . In *Belcher*, this Court, while considering the distinction between an unmatured and a contingent interest, cited *Javorek v. Superior Court of Monterey County*, 17 Cal.3d 629, 636, 131 Cal.Rptr. 768, 777, 552 P.2d 728, 737 (1976), which articulated this distinction as follows:

' "Where there is no contingency as to the garnishee's liability, the only contingency being as to the amount thereof, and where the amount of the liability is capable of definite ascertainment in the future, there is no such contingency as prevents garnishment of the claim, even though, it has been held, it may be that eventually it will be found that nothing is due." ' . . .

"Here, because the garnishee concedes that the seller is entitled to recover any surplus remaining in the escrow fund, there is no question concerning the garnishee's liability. While the amount of that liability cannot presently be determined, it can be definitely ascertained in the future after all disputed claims have been settled. Under these circumstances, the seller has an unmatured interest, and not

a contingent interest, in the escrow fund. This unmatured interest was and still is subject to attachment."

*Fico,* 287 Md. at 160–61, 411 A.2d at 436–37 (some citations omitted).

The rule of law established in *Fico* and *Belcher,* that contingent debts are not attachable, remains valid in spite of the adoption of Md. Rule 2–645, because we lacked the power to, by rule, add a substantive element to a statutorily created action.

On this issue we shall reverse the opinion of the Court of Special Appeals.

### B. Attorney's Lien

This Court has said that " '[t]he cardinal rule [of statutory interpretation] is to ascertain and effectuate legislative intent.' " *Liverpool v. Baltimore Diamond Exchange, Inc.,* 369 Md. 304, 316, 799 A.2d 1264, 1271 (2002) (quoting *Mayor and City Council of Baltimore v. Chase,* 360 Md. 121, 128, 756 A.2d 987, 991 (2000)); *see also State v. Bell,* 351 Md. 709, 717, 720 A.2d 311, 315 (1998) (quoting *Oaks v. Connors,* 339 Md. 24, 35, 660 A.2d 423, 429 (1995)). Legislative intent must be sought in the first instance in the actual language of the statute. *Liverpool,* 369 Md. at 316, 799 A.2d at 1271; *Chase,* 360 Md. at 128, 756 A.2d at 991; *Marriott Employees Fed. Credit Union v. Motor Vehicle Admin.,* 346 Md. 437, 444–45, 697 A.2d 455, 458 (1997); *Stanford v. Maryland Police Training & Correctional Comm'n,* 346 Md. 374, 380, 697 A.2d 424, 427 (1997) (quoting *Tidewater v. Mayor and City Council of Havre de Grace,* 337 Md. 338, 344, 653 A.2d 468, 472 (1995)); *Coburn v. Coburn,* 342 Md. 244, 256, 674 A.2d 951, 957 (1996); *Romm v. Flax,* 340 Md. 690, 693, 668 A.2d 1, 2 (1995); *Oaks,* 339 Md. at 35, 660 A.2d at 429; *Mauzy v. Hornbeck,* 285 Md. 84, 92, 400 A.2d 1091, 1096 (1979); *Board of Supervisors v. Weiss,* 217 Md. 133, 136, 141 A.2d 734, 736 (1958). Furthermore, where the statutory language is plain and free from ambiguity, and expresses a definite and simple meaning, courts do not normally look beyond the words of the statute

itself to determine legislative intent. *Liverpool,* 369 Md. at 316–17, 799 A.2d at 1271–72; *Chase,* 360 Md. at 128, 756 A.2d at 991; *Marriott Employees,* 346 Md. at 445, 697 A.2d at 458; *Kaczorowski v. Mayor and City Council of Baltimore,* 309 Md. 505, 515, 525 A.2d 628, 633 (1987).

However, in *Tracey v. Tracey,* 328 Md. 380, 387, 614 A.2d 590, 594 (1992), this Court opined, in reference to construing an alimony statute, that when ambiguity is present:

> "[w]hile the language of the statute is the primary source for determining legislative intention, the plain meaning rule of construction is not absolute; rather, the statute must be construed reasonably with reference to the purpose, aim, or policy of the enacting body. The Court will look at the larger context, including the legislative purpose, within which statutory language appears. Construction of a statute which is unreasonable, illogical, unjust, or inconsistent with common sense should be avoided." [Citations omitted.]

*See also Miles v. State,* 365 Md. 488, 516–17, 781 A.2d 787, 803–04 (2001). Petitioners assert that McCartney, New Panorama's attorney, had a valid statutory attorney's lien, under § 10–501 of the Business Occupations and Professions Article of the Maryland Code (hereinafter "§ 10–501"),[12] on $95,000 within the settlement fund created during the *New Panorama v. CCS* litigation. The Court of Special Appeals found this assertion to be erroneous and in conflict with the "plain and unambiguous" language of § 10–501. As the plain language of § 10–501 does not include "settlement" or "settlement funds," and petitioners' interpretation does not harmonize with other provisions of the Maryland Code, we affirm the decision of the lower court and hold that McCartney did not have a valid statutory lien on the monies within the settlement fund.

Section 10–501 at the time relevant here states:

---

12. Maryland Code (1957, 2000 Repl.Vol.), § 10–501 of the Business Occupations and Professions Article. The statute has since been amended by the Legislature to include settlements.

"(a) *In general.*—Subject to subsection (b) of this section, an attorney at law has a lien on:

   (1) an action or proceeding of a client of the attorney at law from the time the action or proceeding begins; and

   (2) a judgment or award that a client receives as a result of legal services that the attorney at law performs.

(b) *Limited to fee arrangement.*—A lien under this section attaches only if, and to the extent that, under a specific agreement between an attorney at law and a client, the client owes the attorney at law a fee or other compensation for legal services that produced the judgment or award.

(c) *Subordination of lien.*—A lien under this section is subordinate only to:

   (1) a prior lien for wages due to an employee of the client for work related to the judgment or award; or

   (2) a lien for taxes that the client owes the State.

(d) *Execution.*—An attorney at law may retain property subject to a lien under this section and bring an action for execution under the lien only in accordance with rules that the Court of Appeals adopts."

While we have not previously determined its scope, as we read its language, § 10–501 was clear and unambiguous; subsection (a)(1) provided when a lien could attach, while subsection (a)(2) provided what types of funds a lien could attach to. The statute provided that while the right to a lien came into existence from the inception of an action, the attorney's lien that might result under the statute was (at that time) solely on "a *judgment or award* that a client receives as a result of legal services that the attorney at law performs." Section 10–501(a)(2) (emphasis added). This does not, under the circumstances of this case, include a lien on settlement funds. In combination, the language of both subsections of Section 10–501(a) instructed attorneys that they had the right to a lien on the judgment and awards for their services arising out of an action or proceeding of a client, from the time that proceeding began. Subsection (a)(1)'s essential purpose was to allow attorneys to attach liens only on future court judgments or

awards at any time after the proceeding that results in such judgment or awards is initiated. As we "may neither add nor delete language" to a statute, we hold that the Legislature in enacting the statutes at issue here, would have used language including settlement agreements within subsection (a)(2) if it had indeed intended those agreements to be covered by the lien. *Chesapeake & Potomac Tel. Co. of Maryland v. Dir. of Fin. for Mayor and City Council of Baltimore,* 343 Md. 567, 579, 683 A.2d 512, 517 (1996).

This interpretation is consistent with our reading of the other provisions of both § 10–501 and another lien law within the Maryland Code. Recently, in *Liverpool,* 369 Md. at 317, 799 A.2d at 1271–72, we stated:

"We have acknowledged that, in ascertaining a statute's meaning, we must consider the context in which a statute appears. *See Chase,* 360 Md. at 129, 756 A.2d at 991–92. . . . In this regard we have instructed:

'When the statute to be interpreted is part of a statutory scheme, it must be interpreted in that context. That means that, when interpreting any statute, the statute as a whole must be construed, interpreting each provision of the statute in the context of the entire statutory scheme. Thus, statutes on the same subject are to be read together and harmonized to the extent possible, reading them so as to avoid rendering either of them, or any portion, meaningless, surplusage, superfluous or nugatory.'

*Whiting–Turner Contracting Co. v. Fitzpatrick,* 366 Md. 295, 302–03, 783 A.2d 667, 671 (2001) (internal quotations omitted) (citations omitted)." [Some citations omitted.]

Both §§ 10–501(b) and (c) include language that identifies judgments and awards as being the attachable property under § 10–501. Section (b) limits the attachment of the lien to prior fee agreements to when there is "a specific agreement between an attorney at law and a client, [and] the client owes the attorney at law a fee or other compensation for *work related to the judgment or award.*" Section 10–501(b) (emphasis added). Subsection (c)(1) states that such a lien is subor-

dinate to "a prior lien for wages due to an employee of the client for *work related to the judgment or award.*" Section 10–501(c)(1) (emphasis added). This language contemplated that the funds to which a lien attached included only funds procured from a judgment or award.

In contrast, the Legislature had, by the time relevant in this case, included language referring to settlements in its hospital lien statute. Maryland Code (1975, 2000 Repl.Vol.) § 16–601(a) of the Commercial Law Article of the states:

"(a) *Creation of lien.*—A hospital which furnishes medical or other services to a patient injured in an accident not covered by the Maryland Workers' Compensation Act has a lien on 50 percent of the recovery or sum which the patient or, in case of death, the heirs or personal representative of the patient collect in judgment, settlement, or compromise of the patient's claim against another for damages on account of the injuries."

Unlike in the statute involved in the case *sub judice,* the Legislature specifically enumerated other funds besides an award or judgment, specifically those arising out of "settlement or compromise," that can be attached by the hospital lien. If the Legislature had wanted to include settlement funds in the applicable attorney lien law at issue here, it knew how to do it; but it chose not to.[13] These statutory provisions support our interpretation that the clear and unambiguous language of § 10–501 did not provide for an attorney's lien on settlement funds.

In spite of the clear language of the relevant § 10–501, petitioners argue that the legislative history of the attorney's lien statute favors their interpretation of that prior Section 10–501; we disagree.[14] The purpose language set forth in Senate Bill 36 of 1985 states that: "the purpose of providing

---

13. As we indicated earlier the Legislature has now done so.

14. Although the law does not require us to go any further as we hold § 10–501 to be unambiguous, we believe that a discussion of the legislative history and case law lends further support to our holding.

that an attorney has a lien on certain actions of the attorney's client and certain judgments entered in favor of the attorney's client" 1985 Md. Laws Chapter 723. During the debates preceding the date when Maryland's attorney's lien statute first appeared in Article 10, § 46 of the Maryland Code, as enacted under Senate Bill 36 of the 1985 legislative term, the Legislature is presumed to have been aware of our case law regarding the purpose and definition of such liens, *i.e.,* charging liens. This Court has recognized such a lien's definition and its difference from a common law retaining lien. In *Ashman v. Shecter,* 196 Md. 168, 173–75, 76 A.2d 139, 141–42 (1950), we first discussed these definitions when we stated:

"At common law attorney's liens are of two kinds. One is a retaining lien on all papers, securities and money belonging to his client which come into his possession in the course of his professional employment. This is a general lien which gives him the right to retain such things until all his charges against his client are paid. As the name implies, it is dependent upon possession. It is, generally speaking, a passive lien and cannot be actively enforced either at law or in equity. The other lien is a charging lien, *which binds a judgment* recovered through the attorney's efforts. This lien ... was based upon the broad principle of justice that an attorney, as a recognized officer of the court, *should be paid his fees and expenses out of any judgment obtained* as the result of his labor and skill. It was a means invented by the courts to protect attorneys from being cheated by their clients by preventing the clients from receiving the fruits of recoveries without paying for the valuable services by which the recoveries were obtained.

"In New York prior to 1848, an attorney was entitled to a lien upon a judgment recovered by him, but the amount of his lien was limited to his taxable costs. By the Code of Procedure of 1848, the statutes regulating the costs of fees of attorneys in civil actions were repealed, and the compensation of the attorney was left to be determined by the contract of the parties. The implied equitable lien was consequently extended to cover the attorney's compensa-

tion, whatever the amount, in all cases where *judgment was obtained.* To the extent of his compensation the attorney was deemed an equitable assignee of the judgment, and had a lien upon it when recovered.

"The scope of the charging lien was explained by Judge Cardozo in the New York Court of Appeals in the following language: 'The very reason for its existence was to save the attorney's rights where he had been unable to get possession.  * * *  A clandestine or collusive payment, after notice, actual or constructive, of the lien, did not discharge the debtor.' " [Citations omitted.][Emphasis added.]

This Court has reaffirmed *Ashman's* definitions several times, which illustrates that charging liens were created for the purpose of securing an attorney's interest in final *judgments and awards.*  *See Attorney Grievance Comm'n v. Sheridan,* 357 Md. 1, 31–35, 741 A.2d 1143, 1159–60 (1999) (discussing attorney liens in the context of an attorney disciplinary hearing); *Staley v. Board of Education of Washington County,* 308 Md. 42, 46, 517 A.2d 349, 351 (1986) (stating that the Maryland Workman's Compensation statute provides a charging lien which "protects a claimant's counsel by imposing a charging lien for his benefit on the compensation *awarded* the employee in the amount of the fee") (footnote omitted) (emphasis added); *Diamond v. Diamond,* 298 Md. 24, 34–36, 467 A.2d 510, 516 (1983) (examining attorney lien law in Maryland); *Campen v. Talbot Bank of Easton,* 271 Md. 610, 614, 319 A.2d 125, 128–29 (1974) (discussing *Ashman* in determining whether an attorney had a lien); *Chanticleer Skyline Rm., Inc. v. Greer,* 271 Md. 693, 700 n. 3, 319 A.2d 802, 805 n. 3 (1974) (citing to *Campen* and *Ashman* for a thorough discussion on the law of attorney liens in Maryland); *St. Joseph Hospital v. Quinn,* 241 Md. 371, 377–79, 216 A.2d 732, 734–37 (1966) (discussing the meaning of Maryland's hospital lien law, Md.Code (1964 Repl.Vol.), Art. 63, §§ 46 through 50, through analogy to New York's case law).

Two years previous to the enactment of Maryland's attorney lien statute, we decided *Diamond,* 298 Md. 24, 467 A.2d 510. In that case, an attorney, Orman, also argued that he had a

lien on settlement funds.[15] Quoting *Ashman*, we discussed the differences between retaining and charging liens, ultimately holding that, under the circumstances of that case, neither existed. In recognizing that Maryland had no charging lien at the time, we stated: "[t]he only way a lien could have attached to the settlement proceeds is if Maryland law provided for the charging lien under these circumstances. Unfortunately for Orman, it does not." *Id.* at 36, 467 A.2d at 516. We presume that the Legislature was aware of the situation, that existed in *Diamond*, where an attorney argued that he had a lien on a client's settlement funds. Coupling this with the language of § 16–601 of the Commercial Law Article, discussed *supra*, we hold that the Legislature would have included specific language in § 10–501 creating an attorney lien on settlement funds if it had actually intended to do so.

Petitioners also claim that the current Legislature's enactment of an amendment to Section 10–501 was a "swift reaction to the opinion of the Court of Special Appeals in this case" and that the amendment speaks to the original Legislature's intent, because the bill was approved and signed by the Governor less than a month after the Court of Special Appeals' decision. Petitioners fail to recognize that one cannot discern the intent of a previous Legislature solely from that of the current one; the two bodies are separate and do not necessarily have the same collective intent. Even if we were to use the 2002 amendments to § 10–501 in an attempt to ascertain the 1985 Legislature's intent, the plain language of the amended law actually favors the interpretation of the Court of Special Appeals and, now, this Court. First and foremost, the amended statute added the word "settlement" to subsection (a)(2), so that it currently reads, "a settlement, judgment, or award that a client receives as a result of legal services that the attorney at law performs." The added

---

15. Orman's specific claim was that the Court of Special Appeals in that case had improperly determined that he never possessed or collected the funds of his client, not that he had no right to a charging lien; this Court discussed charging liens *sua sponte*.

language was not added to subsection (a)(1), as petitioners argue is the place where settlement funds are covered by the statute.[16] In fact, the Legislature also amended sections (b) and (c), not by adding "action or proceeding," but by adding "settlement." In essence, the Legislature did nothing more than expressly add the term settlement, as it did in § 16–601 of the Commercial Law Article, to this statute; it left § 10–501(a)(1) as answering the question of *when* a lien attaches. Finally, the Legislature, in its final action, did not attempt to make the amendments to § 10–501 retroactive,[17] although the initial version of the amendment, House Bill 1381, included a retroactivity provision, thus illustrating the Legislature's intent to effectuate a prospective change in the law of § 10–501(a)(2); not to fix a perceived mistake in prior court interpretations of § 10–501(a)(1).

As prior § 10–501 is clear and unambiguous, the only other way for this court to find for petitioners would be if the settlement agreement in the case *sub judice* constituted a "judgment or award." The well-settled law in Maryland states that:

> "A settlement agreement is not a final judgment. *Clark v. Elza*, 286 Md. 208, 213–15, 406 A.2d 922, 925–26 (1979); *see also Baltimore & Ohio R.R. Co. v. Equitable Bank*, 77 Md.App. 320, 328, 550 A.2d 407, 411 (1988); *Ramsey, Inc. v. Davis*, 66 Md.App. 717, 725, 505 A.2d 899, 903, *cert. denied*, 306 Md. 514, 510 A.2d 260 (1986). The Court of Special Appeals has distinguished between these two related entities [a settlement order and a final judgment]:

---

**16.** In fact, the Legislature clarified the language in subsection (a)(1), which now reads "a cause of action or proceeding of a client of the attorney at law from the time the cause of action arises or the proceeding begins."

**17.** The editor's note of the revised § 10–501 states: "Section 2, ch. 422, Acts 2002, provides that 'this Act shall be construed to apply only to any agreement between an attorney at law and a client of the attorney at law entered into on or after the effective date of this Act.' " The effective date was October 1, 2002.

'Although a settlement order resembles a final judgment, it is not the same. A settlement agreement is a contract which the parties enter into "for the settlement of a previously existing claim by a substituted performance." When this agreement is entered with the court, it is termed a settlement order; however, it is not a court order. Rather, it is a compromise between the parties, which they submit to the court to stay the proceedings in the case.'

*Baltimore & Ohio R.R.*, 77 Md.App. at 328, 550 A.2d at 411 (quoting *Mitchell Properties, Inc. v. Real Estate Title Co.*, 62 Md.App. 473, 482, 490 A.2d 271 (1985)). When parties agree to settlement terms in the presence of the court and ask the court to render a judgment based on that settlement agreement and the court renders a judgment on the settlement, the agreement becomes a final judgment." *Jones v. Hubbard*, 356 Md. 513, 525, 740 A.2d 1004, 1011 (1999). [Alteration added.]

In the case *sub judice*, there is no question that the settlement agreement is not a judgment. The agreement, while read into the record in January 1999 in the *New Panorama v. CCS* litigation, was not presented to the Circuit Court for a rendering of judgment. It was merely " 'a contract which the parties enter into "for the settlement of a previously existing claim by a substituted performance." ' " *Id.* at 525, 740 A.2d at 1011 (quoting *B & O.R.R.* 77 Md.App. 320, 328, 550 A.2d 407, 411 (1988) (quoting *Mitchell Properties*, 62 Md.App. at 482, 490 A.2d at 276)). Thus, petitioner McCartney does not have a statutory lien on the settlement funds. As, at the relevant time, he had no lien on the settlement funds he had nothing for the respondents to garnish even if the settlement funds were themselves garnishable.

## III. Conclusion

Petitioners attempted to settle their suit with New Panorama in the face of extensive litigation. The law encourages settlement in these situations. The suits did not involve matured or unmatured claims, but contingent claims. Accord-

ingly, the claims of garnishment as to the respondents must fail. As to this issue we reverse the Court of Special Appeals.

The unambiguous prior language of § 10–501(a)(1) of the Business Occupations and Professions Article of the Maryland Code, as supported by case law and other statutory provisions, illustrates that an attorney's statutory lien does not apply to settlement funds. Because the settlement agreement is not a judgment or award, McCartney could not, in the alternative, rely on § 10–501(a)(2) to grant him an attorney's lien. As such, McCartney has no lien on the settlement funds. Petitioners correctly asserted that the settlement funds are not garnishable. McCartney does not have an attorney's lien on those funds in any event; thus the Court of Special Appeals was correct in affirming the trial court on this issue.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED IN PART AND AFFIRMED IN PART; CASE REMANDED TO THAT COURT WITH INSTRUCTIONS TO AFFIRM THE JUDGMENT OF THE CIRCUIT COURT FOR HOWARD COUNTY; EACH PARTY TO BEAR THEIR OWN COSTS IN THIS COURT AND IN THE COURT OF SPECIAL APPEALS.**