Dear Delegate Donoghue:
Three years ago, at your request, this Office issued an opinion that discussed the circumstances under which a member of a health maintenance organization ("HMO") may enter into a private contract with a health care provider having no relation to the HMO and whether the statutory prohibition against balance billing of HMO members would apply to that contract. You now ask whether a 2001 amendment of the State HMO law changes the answers given in that opinion.
In our opinion, the 2001 amendment of the HMO law was intended to increase the compensation of trauma physicians when they treat patients who happen to be HMO members. It was not intended to affect the ability of HMO members to enter into private contracts with other health care providers. Nor was it intended to affect the restrictions on direct billing or balance billing of HMO members by other health care providers. However, because the 2001 legislation could be read literally to limit the ability of HMO members to enter into private contracts concerning services included in the HMO benefit package, the General Assembly should clarify its intent with an appropriate amendment of the HMO law.
 I Background
To answer your question, we must place it within the historical context of the balance billing prohibition in the Maryland HMO law.[1] That history was chronicled in some detail in a 1998 opinion of this office. 83 Opinions of the Attorney General ___ (1998) [Opinion No. 98-018 (September 28, 1998)] ("1998 Opinion"). A later opinion issued at your request discussed the relationship of the balance billing prohibition to the ability of a health care provider to bill an HMO member under a private contract between the patient and provider.
85 Opinions of the Attorney General ___ (2000)[Opinion No. 00-030 (November 21, 2000)] ("2000 Opinion"). We first summarize that history and the conclusions reached in those opinions.
A. Prohibition Against Balance Billing of HMO Members
Since 1988, the Maryland HMO law has required contracts between HMOs and health service providers to contain a "hold harmless" clause that bars the provider from charging HMO members for services provided under the contract other than co-payments, other charges permitted by the HMO plan, and charges for services not covered by the HMO plan. See Annotated Code of Maryland, Health-General Article ("HG"), § 19-710
(i). By its terms, this ban against direct billing of HMO members applies only to providers who are under contract with the HMO.
In 1989, this concept was extended to non-contracting providers when the Legislature enacted the prohibition against balance billing of HMO members.[2] See 1998 Opinion at pp. 3-5. As a result, an HMO member is not liable to any health care provider for a "covered service" provided to the member. HG § 19-710 (p)(1). However, the HMO member remains liable for co-payments and co-insurance as provided in the plan, as well as for services not covered by the HMO plan. HG § 19-710 (p)(3).
The "hold harmless" requirement and the prohibition against balance billing together "explicitly provide that subscribers or members owe no debt to any health care provider (i.e., any doctor, hospital, etc.) for any covered services." Riemer v. Columbia Medical Plan, Inc., 358 Md. 222,244, 747 A.2d 677 (2000) (emphasis added). Thus, providers, whether part of the HMO network or not, are prohibited from direct billing or balance billing HMO members for "covered services."[3]
The inability to bill HMO members directly for "covered services" apparently discouraged non-participating providers from treating HMO members. See 1998 Opinion at p. 5. The General Assembly responded in 1991 by enacting HG § 19-710.1. In lieu of billing HMO members directly for services covered by an HMO plan, an out-of-network provider became entitled to reimbursement from the HMO within a specified time period at a more favorable rate than the HMO contract rate. HG § 19-710.1(b). The HMO could in turn seek reimbursement from its member if it determined that any amount paid to the provider was the responsibility of the member. HG § 19-710.1(c)(1).
The new statute also defined "covered service":
 "Covered service" means a health care service included in the benefit package of the health maintenance organization and rendered to an enrollee of the health maintenance organization by a health care provider, including a physician or hospital, not under written contract with the health maintenance organization:
 (i) Pursuant to a verbal or written referral by the enrollee's health maintenance organization or by a provider under written contract with the enrollee's health maintenance organization; or
 (ii) That has been preauthorized or otherwise approved either verbally or in writing by the enrollee's health maintenance organization or a provider under written contract with the enrollee's health maintenance organization.
HG § 19-710.1(a)(3) (2000 Repl. Vol.). While this definition specifically pertained to HG § 19-710.1, that statute was clearly designed to correlate with the prohibition against balance billing for covered services in HG § 19-710(p). The 1998 Opinion summarized this relationship: "Thus, as of 1991, non-contracting providers were entitled to be paid promptly and at a higher rate but were still prohibited from balance billing or otherwise charging HMO members for covered services. All providers, of course, could still directly bill HMO members for non-covered services." 1998 Opinion at p. 6.[4]
The 1991 amendment provided a statutory formula for the compensation that a provider was to receive from the HMO in lieu of billing the patient. In its original version, HG § 19-710.1 directed that hospitals were to be paid at the rate approved by the Health Services Cost Review Commission ("HSCRC"), and that other providers were to be paid at the rate billed or at the provider's "usual, customary, and reasonable" ("UCR") rate. HG § 19-710.1 (b) (1996 Repl. Vol.).
Nine years later, the Legislature altered the method for determining the compensation of non-hospital providers. Under a 2000 amendment, an HMO was to pay a non-hospital provider 125% of the rate that the HMO paid a comparable contracting provider for the same service or the actual rate it had historically paid to non-contracting providers, whichever was greater. Chapter 275, Laws of Maryland 2000. A year later, another amendment added a different methodology for determining payment of trauma care providers. Chapter 423, Laws of Maryland 2001. Your question relates to part of that amendment and is discussed in greater detail in Parts I.C. and II of this opinion.
B. Private Contracts Between HMO Members and Out-of-Network Providers
In 2000, a question arose as to the circumstances under which an out-of-network provider could charge an HMO member the provider's normal fee for services of a type included in the HMO plan. As noted above, with respect to a "covered service," the HMO law clearly set the terms of the provider's compensation from the HMO and barred the provider from directly charging or balance billing the HMO member. In assessing the extent to which an out-of-network provider could directly contract with an HMO member to pay the provider's normal fee, we thus looked to the definition of "covered service" in HG § 19-710.1(a) (3). We concluded:
 The HMO law does not prohibit an HMO member from entering into a private contract with a health care provider outside of the context of the HMO. . . . The balance billing prohibition in the State HMO law applies only to the provision of "covered services."
2000 Opinion at p. 5. We reasoned that, even if a particular service was included in the HMO's benefit package, it would not fit the definition of covered service if the member was not referred to the provider by the HMO and if the HMO did not authorize or otherwise approve the provision of the service to its member. Id. at pp. 5-6. In those circumstances, neither the balance billing prohibition of HG § 19-710(p) nor the provider compensation provisions of HG § 19-710.1 would pertain.
We cautioned that the patient's intent to access the provider outside the HMO plan and the patient's knowledge of the consequences of that decision should be clearly documented at the time a private contract was formed. 2000 Opinion at p. 6. "The written document . . . should clearly and concisely inform the member of the financial consequences of entering into a private contract outside the context of the HMO i.e., that the member will be solely responsible for the provider's charges, that the HMO will not pay the provider, that the provider will not accept payment from the HMO, and that the member's obligation to pay HMO premiums will not be affected." Id.
C. Amendment of Definition of "Covered Service"
After the 2000 opinion was issued, the Legislature amended the definition of "covered service" in HG § 19-710.1. See Chapter 423, Laws of Maryland 2001. That legislation eliminated the two subordinate clauses that condition a "covered service" on a referral, pre-authorization, or other form of approval by the HMO. Thus, the definition now reads:
 "Covered service" means a health care service included in the benefit package of the health maintenance organization and rendered to an enrollee of the health maintenance organization by a health care provider, including a physician or hospital, not under written contract with the health maintenance organization.
HG § 19-710.1(a)(3) (2002 Supp.). As noted above, this definition establishes the universe of services for which an out-of-network provider is entitled to the statutorily-defined reimbursement from the HMO and, concomitantly, is barred from charging the patient.
You have asked whether this amendment affects the ability of an HMO member and an out-of-network provider to enter into a private contract that is outside the context of the HMO and not subject to the balance billing prohibition of the HMO law.
 II Analysis
It might be argued that, with the elimination of any reference to a referral or approval by the HMO, a "covered service" is now simply any service included in the HMO benefit package that an out-of-network provider provides for an HMO member, regardless of whether the HMO authorized performance of the service. As explained above, HG § 19- 710.1 would set the amount of compensation for that service, and the out-of-network provider would be barred from balance billing the member for that service. Under this interpretation, an HMO member and an out-of-network provider could not enter into a private contract that provided for greater compensation to the provider if the service was part of the HMO's benefit package.
On the other hand, it seems unlikely that the Legislature would dramatically restrict the freedom of HMO members to enter into private contracts in such an indirect and circuitous fashion. Moreover, that interpretation would appear to undermine the incentive for a provider to contract directly with an HMO since any provider, whether authorized by the HMO or not, could perform services provided in the HMO benefit package for at least 125% of the contract rate. When a literal interpretation of an amendment appears to yield an illogical result, the principles of statutory construction instruct us to consider the legislative history of the bill and "other material that fairly bears on the fundamental issue of legislative purpose or goal." Kaczorowski v. City of Baltimore, 309 Md. 505, 515, 525 A.2d 628 (1987); see also Consolidated Construction Services, Inc. v. Simpson, 372 Md. 434,456-57, 813 A.2d 260 (2002). That analysis reveals that a mechanically literal interpretation of the amendment would be at odds with the legislative history of the balance billing prohibition and the evident purpose of the 2001 legislation.
The 2001 legislation was focused exclusively on trauma physicians. The sponsor of the bill testified that it was "targeted specifically to physicians that provide trauma care." Tape of testimony of Senator John Astle before the Senate Finance Committee on Senate Bill 728 (March 7, 2001). As outlined above, beginning in 1991, the statute specified a method for determining the amount that an HMO was to pay non-contracting providers for covered services. Between 1991 and 2000, reimbursement of out-of-network physicians was keyed to the UCR rate. As a result of the 2000 legislation, a non-contracting physician was entitled to 125% of the rate paid to a contracting provider, or, if greater, the rate that the HMO had historically paid to non-contracting providers. This new methodology was apparently deemed inadequate for compensation of trauma physicians. The sponsor indicated that the bill was intended to "rectify" that situation. Id.
Other advocates of the 2001 legislation testified that trauma centers treated a disproportionate share of uninsured and underinsured patients. See, e.g., Testimony of Thomas M. Scalea, Physician-in-Chief, R Adams Cowley Shock Trauma Center (March 7, 2001). While hospitals are compensated for those services through the State's hospital rate setting system, trauma physicians do not enjoy similar relief for uncompensated care. Id.
Proponents asserted that the rates allowed under the new methodology, when applied in the context of trauma physicians, resulted in reimbursements "dramatically lower than the already low Medicare fee schedule." Testimony of Andrew N. Pollak, M.D., Maryland Orthopaedic Association, in support of Senate Bill 728. According to testimony of both proponents and opponents of the legislation who appeared before the Legislature, the 2001 legislation was directed to the compensation of trauma physicians when they treated HMO members.
While it was before the Legislature, the bill was amended to tailor it with respect to trauma physicians. Under the original version of the 2001 legislation, a single clause would have been added to HG § 19-710.1(b)(1)(ii) specifying the reimbursement formula for trauma care providers. Under that provision, reimbursement of trauma care providers would have reverted to the pre-2000 formula keyed to the UCR rate a rate apparently believed to be more favorable to the physician. See Bill Analysis for Senate Bill 728 (2001). A Senate amendment substituted a different formula: trauma physicians were to receive either 140% of the Medicare rate or the rate that the HMO had historically paid for the service, whichever was greater. Amendment SB0728/137072/1. Amendments made in the House of Delegates also added certain obligations for trauma physicians, trauma centers, and HMOs. Trauma physicians were obligated to provide additional documentation of treatment at the request of the HMO; trauma centers could be required to verify the credentials of the billing provider as a trauma physician; and an HMO was required to assign a provider number to a trauma physician for purposes of reimbursement, at the request of that physician. Amendment SB0728/343896/1.
As part of the House amendments, the definition of "covered service" was amended to delete the two subordinate clauses that had conditioned the definition upon referral or authorization of the HMO. While the legislative record does not address this particular part of the House amendment, its purpose appears evident in context. A trauma physician confronted with an emergency medical situation involving an HMO member would not necessarily have the benefit of a referral or authorization from the patient's HMO. While the HMO could subsequently provide the necessary authorization to make the treatment a "covered service," the requirement of referral or authorization could at least raise a question as to whether the service was "covered" and whether the HMO was obligated to pay the statutory reimbursement. As in other provisions of the HMO law relating to emergency services, the alteration of the definition of "covered service" was likely designed to ensure that prior authorization was not an obstacle to reimbursement of a trauma physician. See HG § 19.712.5(c) (prior authorization of HMO not required for reimbursement of hospital emergency facility and provider); see HG § 19-705.6 (creating a presumption of HMO authorization in certain circumstances).
There is no indication in the legislative record that the General Assembly was considering reimbursement of non-contracting providers other than trauma physicians.
Surely, if the General Assembly had intended to effect a radical expansion of the balance billing prohibition[5] or to eliminate the ability of providers to enter into private contracts, it would have done so more explicitly. Thus, in our view, "covered service" with respect to services performed by providers other than trauma physicians should be deemed to include whatever referral or authorization conditions, if any, are required by the HMO benefit plan.
However, because the amended version of the definition may create confusion as to the Legislature's intent, we recommend that the General Assembly clarify application of the definition.
 III Conclusion
In our opinion, the 2001 amendment of the definition of "covered service" in the HMO law was part of an effort to increase the compensation of trauma physicians who treat patients who happen to be HMO members. It was not intended to affect the ability of HMO members to enter into private contracts with health care providers. Nor was it intended to affect the restrictions on direct billing or balance billing of HMO members by other physicians.[6] However, because the 2001 legislation could be read literally read to limit the ability of HMO members to enter into private contracts with providers who are not trauma physicians, the General Assembly should clarify its intent with an appropriate amendment of the HMO law.
Very truly yours,
J. Joseph Curran, Jr.
Attorney General
Robert N. McDonald Chief Counsel Opinions Advice
[1] The Maryland Health Maintenance Organization Act is codified at Annotated Code of Maryland, Health-General Article, § 19-701 et seq.
[2] In this opinion, the terms "out-of-network provider," "non-participating provider,"and "non-contracting provider" are used synonymously to mean a health care provider who is not under contract with the patient's HMO to provide services to the HMO's members.
[3] The rules against balance billing do not apply to an out-of-state provider who is not under contract with a Maryland HMO and does not otherwise have the minimum contacts with Maryland that permit application of Maryland law. See 1998 Opinion at pp. 8-12.
[4] In a development not directly related to your question, the Legislature created another vehicle for compensating out-of-network providers for services provided to plan members, which incorporated the possibility of balance billing of plan members. Legislation passed in 1995 required employers who offer health care benefits through an HMO plan to also offer a "point-of-service" option. See Chapter 605, Laws of Maryland 1995, codified at HG § 19-710.2. A point-of-service plan allows a subscriber to receive covered treatment by an out-of-network provider without a prior referral or authorization by the plan, although the subscriber may be liable for additional fees, including balance billing by the out-of-network provider. See 1998 Opinion at pp. 6-7.
[5] It would also be at cross purposes to the ongoing assessment of the provision. The Legislature has directed the Maryland Health Care Commission and the HSCRC to conduct a study and make a recommendation as to the balance billing prohibition in the HMO law. Chapter 250, § 2, Laws of Maryland 2002.
[6] In your letter requesting this opinion, you indicated that you believe that a patient should be allowed to enter into a private contract with a physician who is not under contract with the patient's HMO "and therefore not contractually bound to accept only the HMO payment" (emphasis added). Of course, in a private contract, the physician would not be accepting any HMO payment. If the service by the out-of-network physician was authorized by the patient's HMO, the physician would be limited to the amount of the HMO payment specified in HG § 19-710.1. *Page 54